UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ESTATE OF D.B., by its administrator
Amy Briggs,

                Plaintiff,

v.

THOUSAND ISLANDS CENTRAL          7:15-CV-0484
SCHOOL DISTRICT; THOUSAND          (GTS/ATB)
ISLAND CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION; FRANK HOUSE,
Superintendent of Schools in his individual
capacity; JOHN P. WARNECK, President of
the Board of Education in his individual
capacity; and JOSEPH GILFUS, Thousand
Island High School Principal in his
individual capacity,

                Defendants,

_____

APPEARANCES:                        OF COUNSEL:

METH LAW OFFICES, P.C.            MICHAEL D. METH, ESQ.
  Co-Counsel for Plaintiff
10 Moffatt Lane, Suite 2
Post Office Box 560
Chester, New York 10918

BERGSTEIN & ULLRICH, LLP        STEPHEN BERGSTEIN, ESQ.
  Co-Counsel for Plaintiff
5 Paradies Lane
New Paltz, New York 12561

OFFICE OF FRANK W. MILLER       CHARLES C. SPAGNOLI, ESQ.
  Counsel for Defendants               FRANK W. MILLER, ESQ.
6575 Kirkville Road
East Syracuse, New York 13057

GLENN T. SUDDABY, Chief United States District Judge

## **DECISION and ORDER**

Currently before the Court, in this civil rights action filed by the Estate of D.B. by its administrator Amy Briggs ("Plaintiff") against the Thousand Islands Central School District (the "District"), the Thousand Islands Central School District Board of Education (the "Board"), Frank House Superintendent of Schools in his individual capacity, John P. Warneck President of the Board in his individual capacity, and Joseph Gilfus Thousand Island High School Principal in his individual capacity (collectively "Defendants"), are (1) Defendants' motion to strike the deposition testimony of Defendant Joseph Gilfus and Defendant John P. Warneck pursuant to Fed. R. Civ. P. 32(b) (Dkt. No. 177), and (2) Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 179). For the reasons set forth below, Defendants' motion to strike is denied as moot, and their motion for summary judgment is granted.

# TABLE OF CONTENTS

I.     RELEVANT BACKGROUND ............................................................................... 1

   A.   Plaintiff's Claims ................................................................................... 1

   B.   Statement of Undisputed Material Facts .................................................... 2

   C.   Parties' Briefing on Defendants' Motion to Strike Deposition Testimony ............. 65

   D.   Parties' Briefing on Defendants' Motion for Summary Judgment ......................... 67

      1.   Defendants' Memorandum of Law-in-Chief ............................................. 67

      2.   Plaintiff's Opposition Memorandum of Law ............................................ 69

      3.   Defendants' Reply Memorandum of Law ................................................ 71

   E.   Parties' Briefing on Defendants' Motion to Strike "Plaintiff's Response to Defendants'
   Statement of Material Facts" ...................................................................... 73

II.    GOVERNING LEGAL STANDARD ................................................................. 74

III.   ANALYSIS .......................................................................................... 76

   A.   Motion to Strike Deposition Testimony ..................................................... 76

   B.   Motion for Summary Judgment .............................................................. 77

      1.   Counts One, Two, and Three (Federal Claims Based on Disability Bias Discrimination) . 77

      2.   Counts Four and Five (Federal Claims Based on Sex/Gender
      Discrimination) ................................................................................. 79

      3.   Counts Six and Seven (State Claims) ..................................................... 85

   C.   Motion to Strike Plaintiff's Response to Defendants' Statement of Material Facts .............. 86

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Second Amended Complaint alleges as follows. (Dkt. No. 28.)

D.B. was a sixteen-year-old eleventh-grade student at Thousand Islands High School in the District before he died on March 3, 2014.  (*Id.*)  For years before his death, other students would verbally harass, threaten and bully D.B., and be physically violent towards him, due to his disability, his failure to conform to gender stereotypes, his family's perceived economic status, the way he dressed, the music he listened to, and the hobbies he enjoyed.  (*Id.*)  The harassment and bullying intensified over the years, particularly by a group of repeat offenders, who had been allowed, through the school administration's passive approach and inaction, to engage in constant bullying without effective discipline.  (*Id.*)  More specifically, on several occasions, other students harassed, bullied, and/or physically assaulted D.B.  (*Id.*)  Despite repeated notice by D.B. and his family to Defendants about the harassment and the effect that it had on D.B., Defendants did very little, if anything, and were ineffective at ensuring D.B. was educated without fearing for his safety and emotional well-being.  (*Id.*)  Defendants failed to follow their own established procedures for handling and investigating complaints and for disciplining students involved in harassment.  (*Id.*)  The repeated bullying and harassment, accompanied by anti-gay and gender-related slurs, caused D.B. to commit suicide on March 3, 2014, in his bedroom, with a shotgun.  (*Id.*)

Generally, based on these factual allegations, the Second Amended Complaint asserts the following seven claims: (1) a claim of disability discrimination pursuant to § 504 of the Rehabilitation Act against the District and the Board ("Count One"); (2) a claim of disability

discrimination pursuant to Title II of the Americans with Disabilities Act ("ADA") against the

District and the Board ("Count Two"); (3) a claim of disability discrimination pursuant to 42

U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S.

Constitution against the District, the Board, and Joseph Gilfus ("Count Three"); (4) a claim of

sex discrimination for failing to conform to gender stereotypes pursuant to 42 U.S.C. § 1983 and

the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution against the

District, the Board, and Joseph Gilfus ("Count Four"); (5) a claim of sex discrimination for

failing to conform to gender stereotypes pursuant to Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681 et. seq., against the District and the Board ("Count Five"); (6) a claim of

negligent supervision against the District and the Board ("Count Six"); and (7) a claim of

negligent infliction of emotional distress against Defendants ("Count Seven").  (*Id.*)  As relief,

Plaintiff seeks compensatory and punitive damages.  (*Id.*)

### B.     Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in

their Rule 7.1 Statement and not successfully denied by Plaintiff in a Rule 7.1 Response that both

*matched* the paragraphs of Defendants' Rule 7.1 Statement and *specifically cited* the record

where the factual issue arises, as required by Local Rule 7.1(c) of the Local Rules of Practice for

this Court.  (*Compare* Dkt. No. 179, Attach. 19 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 189,

Attach. 7 [Plf.'s Rule 7.1 Response].)

## The Parties

1.      D.B. was a minor student of the District from 2002 until March 3, 2014, and a member of the class slated to graduate in June, 2015. D.B. committed suicide at home in his bedroom on March 3, 2014.

2.      D.B. played modified football at the District in ninth grade for one season, and varsity football for a period during his junior year.

3.      Amy Briggs is the mother of D.B. and the administratrix of his estate.

4.      The District is a public Central School District located in Jefferson County, New York.

5.      The Board is the board of education of the District.

6.      Defendant House was the superintendent of schools for the District from July 1, 2012, to December 31, 2015.

7.      Defendant Warneck served on the Board from 1987 to June 30, 2016 (except for a period from 2002 through 2005), and most recently was the President of the Board from July 1, 2011, to June 30, 2016.

8.      Defendant Gilfus is the principal of the District's high school and has held that position since February, 2004.

## D.B.'s Statements of the Issues that Caused His Emotional Distress and Suicide

9.      The New York State Police recovered texts sent by D.B. on his cell phone over a period of several months leading up to his suicide.  Defendants further engaged forensic consultants to recover the same texts from the cell phone so that the texts could be viewed in a conversation-by-conversation format.

10.     The names "I'm cool," "randy.swag," and "3157830068," which are listed as senders or recipients of various texts and messages, were all account names or aliases of D.B.[1]

11.     D.B. also underwent therapy at various points in his life, including for a period from November, 2009 through August, 2011 with Dr. Rebecca Laufer, a psychologist.

12.     Those therapy sessions covered the period from the middle of D.B.'s seventh-grade year through just before the beginning of his ninth-grade year.

13.     Dr. Laufer testified that there is nothing omitted from her notes, that she felt was important to an understanding of her work with D.B.

14.     During his therapy with Dr. Laufer, D.B. made many comments, including statements on multiple occasions that his mother and/or his parents were responsible for his problems, and that he hated his mother and wished she was dead.

15.     Dr. Laufer concluded that D.B. "despises" his mother.

---

[1]     Both Plaintiff and Defendants cite to text messages purportedly sent by D.B. prior to his death discussing stressors in his life to suggest why he committed suicide. The Court finds that these messages are either not admissible or not material to deciding Defendants' motions. As an initial matter, there is no evidence before the Court that Defendants had actual knowledge of these messages prior to D.B.'s death. In addition, the Court does not interpret Defendants' motion as arguing that Plaintiff lacks damages or the ability to prove that its damages are caused by Defendants. Instead, Defendants' arguments center around whether there is admissible evidence that Defendants or other members of the District with authority to address alleged discrimination and institute corrective measures had actual knowledge of bullying or harassment of D.B. on the basis of a protected characteristic. Moreover, without D.B.'s testimony, a trier of fact is unable to confirm whether D.B. sent the messages in question. Merely because a message is transmitted by a certain phone number or username is not necessarily evidence that a particular person sent that message. This is particularly true in a high school setting where not all students may have a mobile phone and students may borrow or periodically use another's phone for various reasons. For all of these reasons, the Court finds that the messages on D.B.'s phone before his death regarding stressors in his life are not material for purposes of this motion for summary judgment.

16.     In fact, during the therapy, Dr. Laufer's notes indicate that "[a]t one point he stated the problem is his parents and the solution would be to kill himself. . . . He [D.B.] denied a plan or intent and there appeared to be a reactionary tone in his expression of this statement, which he likely knew would deeply upset his mother.  This concern was explored and he did not appear at risk."

17.     D.B. similarly told various of his fellow students over the years that he hated his mother and/or his parents, that he hated his home life, and that he would rather be dead than live at home.

18.     In fact, D.B. claimed to Defendant Joseph Gilfus that he had suffered physical abuse at the hands of his parents, which led to Defendant Gilfus reporting D.B.'s account to Child Protective Services, which investigated the claim (including interviewing D.B.'s parents at the family home). D.B. never recanted this account.

<u>D.B.'s Use of Antigay Slurs and Comments</u>

19.     D.B. habitually used "gay" and other slurs such as "faggot" and "queer."

20.     In fact, in the texts recovered from D.B.'s phone, during the period from December 19, 2013, to March 3, 2014, he used antigay slurs nearly seventy times.[2]

---

[2]     Plaintiff's denial of the ability to confirm this assertion of fact is insufficient to create an issue of fact and the Court will deem it an admission.  *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); *Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "[o]n a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . . Similarly, a response contending to neither admit or

21.     On February 27, 2014, the username "I'm cool" also stated his belief that homosexuals were "all fucked up and should be cooked like the Jews were" and that homosexuals' "minds r fucked up and they need to be burned in a [sic] oven."

22.     In fact, upon learning that an individual with whom "I'm cool" was exchanging texts was homosexual, on February 27, 2014, the username "I'm cool" stated, "Go kill urself," "Get smoked by a fuckin bus," and "So go put a slug thro [sic] ur face and save mankind," adding, "It's Adam and Eve not Adam and Steve."

23.     When asked, "Did you just say [god] fucked up?" "I'm cool" responded, "He did when he made gays."

### D.B.'s Urging of Other People to Commit Suicide

24.     D.B. also told people he did not like, or with whom he was engaging in an argument, to kill themselves. For example, in the three-month period from December 23, 2013, to February 27, 2014, he told at least twenty individuals by text to kill themselves: "Go kill urself," "I told my friend to kill himself," "K bye now, remember to hold ur deal and kill urself, see you in hell," "Fucking kill urself," "Tell her to kill herself, she flipped on me for sayin [sic] that to her," "Quite bein [sic] a baby and sayin [sic] oh I'm planning on it, grow some balls and jump off a fucking building," and "Ok I know what, fuck u, fuck ur gay ass friends, go fucking dip and crash fords together and try to kill urself, whatever u do, plz succeed and killing urself and all ur gay little friends."[3]

---

deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

[3]     As set forth above in footnote 2 of this Decision and Order, Plaintiff's denial of lack of knowledge is insufficient to create an issue of fact for trial.

<u>D.B.'s History of Involvement with the Police and Treatment for Mental Illness</u>

25.    In first and second grades, D.B. received medical and counseling services from Guardino Elementary School Based Health Clinic (also known as "Viking Care Clinic").

26.    D.B. received therapeutic counseling from Dr. Douglas Ort from May through September, 2009.

27.    As discussed above, D.B. underwent therapy through Dr. Rebecca Laufer of Samaritan Behavioral Health Services from November 2, 2009 through August, 2011.

28.    D.B. also received psychotherapy and other forms of counseling with Dr. John Savino, Dr. Jason Wise, Dr. Raymond Sleszynski, and Dr. Stephen Fitzgerald during various periods between 2010 and 2013.

29.    On or about April 4, 2010, D.B.'s mother and her husband called the police when D.B. refused to get out of the family vehicle.

30.    On or about September 12, 2010, D.B.'s mother and/or her husband called the police when D.B. responded to a request to pick up his room by screaming and throwing things.

31.    In or about January, 2011, D.B.'s mother and/or her husband called the police with regard to undescribed conduct of D.B.

32.    In or about February, 2011, D.B.'s mother and/or her husband called the police with regard to undescribed conduct of D.B.

33.    On or about March 16, 2011, D.B.'s mother called the police when D.B. threw a box of crackers across the room and then pulled a telephone (or its cord) from the wall in an attempt to prevent her from calling the police. D.B. was charged with criminal mischief and received probation through August 1, 2011.

34.     On or about May 20, 2011, D.B.'s mother and/or her husband called the police when D.B. became angry and slammed the door to the family home so hard it damaged the door jamb and the lock.

35.     On or about August 8, 2011, D.B.'s mother called the police when D.B. had a "tantrum" and threw books because D.B.'s mother was unavailable to supervise him using a gun while hunting.

36.     In or about January, 2012, D.B.'s mother and/or her husband called the police with regard to undescribed conduct of D.B.

37.     D.B. was hospitalized at BryLin Hospital for mental health issues from January 27, 2012, through February 4, 2012.

38.     D.B. underwent psychotherapy with Dr. Raymond Sleszynski from approximately February 20, 2012, through June 27, 2013.

39.     D.B. also received psychological, therapeutic and counseling services at some time between 2008 and March, 2013 from the Children's Home of Jefferson County and Transitional Living Services Waiver Program.

40.     An assessment performed by the Children's Home of Jefferson County included information provided by D.B.'s mother and her husband describing D.B.'s serious misconduct, his issues at home, his hatred for his mother and accusations that his parents abused him, and other matters. It made no reference to bullying or harassment at the District.[4]

---

[4]     Although Plaintiff began its response with the word "undisputed," Plaintiff then asserted facts that attempted to either undermine Defendants' asserted facts, or deny an implication of those asserted facts, which is improper in a Rule 7.1 Response. *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) ("[T]he Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each

<u>D.B.'s Propensities for Violence and Lying, and His Distorted Perception of Events</u>

41.     D.B.'s mother admitted that D.B. "exaggerates the extent of things over time," and "likes

        to have control and also play the victim."  D.B.'s mother has also acknowledged that

        D.B. lied about incidents that occurred within the home. Dr. Laufer noted, "It often

        appears he tries to manipulate events so that he can try to make his parents look bad."

42.     D.B.'s mother contends that D.B.'s report to Defendant Gilfus of physical abuse by his

        father, which led to a Child Protective Services investigation, was not truthful.

43.     D.B.'s psychopharmacologist, Dr. Savino, stated his opinion that D.B. had "moved his

        thinking and actions into a totally out of control system," that D.B. was "absolutely

        convinced that all types of terrible things are perpetrated on him and that he does not do

        anything serious or threatening," and that D.B. "literally cannot think in a straight manner

        and he simply has everything distorted to the point where he truly believes that some of

        these horrible issues are happening to him . . . [and] has a hard time seeing that he

        instigates them; and . . . that the consequences are not nearly to the level that he sees

        them at."

44.     Dr. Savino also found that D.B.'s "distorting borders on the paranoid and the delusional."

---

instance is, in fact, 'Undisputed.'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL
1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants
is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *Goldstick v.
The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking
plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy
narrative in almost every case the object of which is to 'spin' the impact of the admissions
plaintiff has been compelled to make"); *Yetman v. Capital Dist. Transp. Auth.*, 12-CV-1670,
2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point
of law that summary judgment procedure involves the disputation of asserted facts not implied
facts).   To the extent that a non-movant desires to set forth any additional material facts that it
contends are in dispute, it is required by Local Rule 7.1(a)(3) to do so in separately numbered
paragraphs.

45.    Dr. Sleszynski reached the same conclusion.

46.    According to Dr. Laufer's records, D.B. was diagnosed with Mood Disorder NOS, ADHD, and Oppositional Defiant Disorder.

The District's Policies, Training Programs, Seminars, Presentations, and Prevention Efforts Respecting Bullying, Discrimination, and Harassment Prior to D.B.'s Death

47.    Students entering the high school receive a student agenda/handbook that includes an age-appropriate summary of the Code of Conduct.

48.    In order to graduate, each student within the District must undergo education regarding civic values, cultural/social differences, and developing tolerance and respect for others, as well as how diversity in American social institutions, traditions, and values has contributed to a unique national heritage.  This instruction is primarily provided in English, Social Studies, and Health classes.[5]

49.    Every year, the guidance counselors every year conduct a program in the elementary schools stressing tolerance and mutual respect.[6]

50.    The various schools in the District each have a "Building Planning Team" that performs various services, including regular surveys on topics including bullying and harassment.

51.    The Building Planning Team survey results are used to generate "Building Action Plans" on an annual basis.

---

[5]    Plaintiff's response disputing this fact is insufficient for two reasons.  First, it appears that Plaintiff is claiming a lack of personal knowledge, which, as discussed above in footnote 2 of this Decision and Order, is insufficient to create a genuine issue of fact for trial.  Second, a non-movant cannot claim inadequate discovery without satisfying the requirements set forth in Fed. R. Civ. P. 56(d), which Plaintiff has failed to do.

[6]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's response that it lacks personal knowledge is insufficient to create an issue of fact for trial.

52. Each year the middle school guidance counselors put on a "Bullying Prevention Program" for the students in sixth grade.

53. Beginning on or about 2008, the District introduced Rachel's Challenge, an anti-bullying and anti-violence program.

54. Activities relating to Rachel's Challenge and posters concerning its message continued through the following years, including at least through the 2011-2012 school year.

55. The elementary schools of the District require students to participate in Developmental Guidance classes that focus on bullying, conflict resolution, empathy, personal safety, and safety in general.

56. The elementary schools also implement lessons from "The Great Body Shop" curriculum that include bullying and empathy topics.

57. During the 2011-2012 school year, the New York State Police conducted a workshop in the middle school concerning bullying.

58. In 2010 and 2013, Jared Campbell conducted an assembly at the middle school and high school that included anti-bullying messages.

59. Defendant Warneck took a course on the requirements of the Dignity for All Students Act ("DASA") at the Fulton-Hamilton-Montgomery BOCES, and also watched a one-hour state-produced webinar on the topic, in 2012.

60. Because Defendant Warneck and his colleagues in the area felt the state webinar was inadequate, they developed their own, two-hour webinar presentation for the administrators in their school districts on the subject of DASA.

61. The District's administrators underwent DASA training in August and September, 2012.

62. Defendant House, the District's superintendent of schools, attended a seminar called "Protect Your Students from Bullying, Harassment and Violence" on August 8, 2013.

63. Defendant House gave DASA presentations to the Board two to three times between 2012 and 2013.

64. In Fall, 2013, the Board and Defendant House communicated with Captain Timothy Patterson concerning a possible presentation concerning discrimination and harassment. The Board requested the presentation for early 2014, but Captain Patterson's military service did not permit him to perform the presentation until after D.B.'s death.[7]

65. The District was also working to transition in the "Sources of Strength" suicide and bullying prevention program in 2013-2014 prior to D.B.'s death.[8]

The District Employees Who Had Authority to Correct and Deter Bullying and Harassment

66. At the District, the principal of each individual school had authority to administer discipline to students.[9]

---

[7] Plaintiff's response attempting to dispute this fact is insufficient because it cites to e-mail correspondence between Captain Patterson and various members of the District, which merely confirms the fact stated by Defendants.

[8] Plaintiff's response attempting to dispute this fact is insufficient. It is irrelevant how Defendant House first became aware of the "Sources of Strength" suicide and bullying prevention program. As a result, the fact that Bobbi Nevala's affidavit does not mention a conversation with Defendant House regarding the Sources of Strength program is not material, nor does such an omission contradict Defendant House's deposition.

[9] There is an issue of fact as to whether the superintendent of schools also had authority to administer discipline to students. However, to the extent this issue of fact exists, it is only a dispute regarding whether, in addition to the principals, the superintendent of schools also had such authority. It is undisputed that no other District employees had such authority. Moreover, Plaintiff states in its counter statement of additional facts in dispute, "Gilfus is ultimately responsible for discipline within the high school." (Dkt. No. 189, Attach. 8, at ¶ 5.)

67. School-wide presentations and programs were subject to the approval of the principals.[10]

68. District-wide presentations and programs were subject to the approval of the District's Board of Education and the superintendent of schools.[11]

69. Bus drivers, studyhall monitors, hall monitors, guidance counselors, and individual faculty members such as teachers did not have authority to impose discipline, and had to submit referrals to the appropriate principal for determination of disciplinary matters.

<u>The General Absence of Physical or Serious Bullying at the District</u>

70. D.B.'s fellow students T.C., K.K., and K.D. did not witness much bullying going on at the District.

71. A.B. testified that discipline was "somewhat strict" at the District and he did not see a lot of bullying or harassment at the District with the exception of bullying of D.B.

72. J.R. similarly testified discipline was "pretty strict" at the District and he did not see a lot of bullying.[12]

---

[10] As set forth above in footnote 2 of this Decision and Order, Plaintiff's response that it lacks personal knowledge is insufficient to create an issue of fact for trial.

[11] As set forth above in footnote 2 of this Decision and Order, Plaintiff's response that it lacks personal knowledge is insufficient to create an issue of fact for trial.

[12] A non-movant may not create a genuine issue of material fact by simply challenging the credibility of a declarant. *See Desia v. GE Life & Annuity Assurance Co.*, 350 F. App'x 542, 545 (2d Cir. 2009) ("This general attack on Stewart's competence, even if credited, provides no evidence . . . . [a]ccordingly, we uphold the award of summary judgment in favor of defendants."); *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact."); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness'] honesty"); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp.2d 378, 391 (S.D.N.Y. 2012) ("Neither conclusory assertions, nor contentions that the affidavits supporting the motion are not credible, create a genuine issue of material fact."); *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 439 (S.D.N.Y. 2007) ("[T]he burden is one

73.　To the extent that these students allegedly utilized antigay slurs amongst themselves, (whether directed at D.B. or at each other), they were careful to do so out of the presence or hearing of school district employees.[13]

74.　When used by these students, words like "gay" and "faggot" were used as synonyms for "stupid."[14]

---

of production, not persuasion; it can involve no credibility assessment"); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378 (S.D.N.Y.1979) ("[A] naked attack upon the affidavits of a moving party is, without more, insufficient to place the credibility of the affiant in issue.")

[13]　As set forth above in footnote 2 of this Decision and Order, where a non-movant neither admits nor disputes a fact, the response is deemed an admission. Moreover, Plaintiff provided additional factual support of this asserted fact. Accordingly, the Court will deem the statement as admitted. *See Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to the defendant's statement where the plaintiff's response paragraphs did not specifically dispute the defendant's statements or consisted of "conclusory allegations, speculation, or conjecture").

[14]　The Court deems this fact admitted because Plaintiff did not provide a specific citation to the record where the factual issue purportedly arises. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established. . . . Each denial shall set forth a specific citation to the record where the factual issue arises."); *Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Janneh v. Regal Entm't*, 07-CV-0079, 2009 WL 2922830, at *1, n.3 (N.D.N.Y. Sept. 8, 2009) ("In response . . . Janneh filed a 'Statement of Material Facts Not in Dispute.' . . . The document consists of . . . a phrase at the end of the document stating simply: 'See Attached Exhibits.' Janneh's statement fails to comply with the Local Rules which Janneh has repeatedly been advised about . . . ."); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. . . . [A] vague cite to all of the exhibits is simply unacceptable.").

75. When discussing students' use of the term "gay," R.M. testified that "anytime that someone was actual homosexual, they didn't ever use it as an insult. It was always the nicest – they were always the nicest possible to them and most respectful to them in that way. If that person, if someone was straight, like if they knew someone was straight or thought they were straight or whatnot, they used it as an insult."

The Absence of Reports of Discrimination-Based Bullying or Harassment of D.B.

76. Prior to D.B.'s death, Defendant Gilfus never received any report or otherwise knew that D.B. was being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur, a slur relating to gender stereotyping, or a slur relating to disability bias at the high school or on the school bus (with the exception of one disproved report concerning the January 2013 A.M. Bus Incident).[15]

---

[15] Plaintiff disputed this fact and cited to the testimony of A.B. and M.M.2, who are also students. However, Plaintiff still failed to establish an issue of fact as to Defendant Gilfus' knowledge. First, Plaintiff directed the Court to its statement of additional material facts in dispute (Dkt. No. 189, Attach. 8, at ¶¶ 135, 141), wherein it cited the testimony of A.B. A.B. testified as follows:

> Q: Did you ever hear anybody call D a retard?
>
> A: Yeah.
>
> Q: Who?
>
> A: I don't know.
>
> Q: How often did that happen?
>
> A: I heard it one time in our Earth Science class. Sometimes we would be behind on Earth Science labs and the teacher had told D, you have to get these labs done. You should stay after class or after school, which I would do as well and I heard somebody just plainly say retard, that's it.

77. Defendant House never even heard D.B.'s name prior to D.B.'s death, and had no knowledge or report of D.B. being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur, a slur relating to gender stereotyping, or a slur relating to disability bias.[16]

_____

Q: To your knowledge did the teacher hear that?

A: Said, hey, cut it out.

(Dkt. No. 189, Attach. 22, at 11.) Whether a teacher was aware of such statements is not the same as Defendant Gilfus having actual knowledge of the incident. Plaintiff's statement of additional material facts in dispute also identified the testimony of M.M.2, wherein M.M.2 testified that she witnessed two middle school students push D.B. into a snow bank stating, "That's where you belong." (Dkt. No. 189, Attach. 8, at ¶ 141.) Such a report by M.M.2 to Gilfus would not have put Defendant Gilfus on actual notice that D.B. was being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur, a slur relating to gender stereotyping, or a slur relating to disability bias. Second, Plaintiff cited to two incidents from the deposition testimony of M.M.2. (Dkt. No. 189, Attach. 7, at ¶ 92.) With regard to the first incident described by M.M.2, M.M.2 testified that she reported to teacher Mrs. Flick that D.B. would be late to class because he was in the office reporting someone saying harsh words to him. (Dkt. No. 189, Attach. 56, at 62.) Again, Mrs. Flick is not the same as Defendant Gilfus. In addition, reporting that "someone" said "harsh words" alone would not have put anyone on actual notice that D.B. was being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur, a slur relating to gender stereotyping, or a slur relating to disability bias. With regard to the second incident described by M.M.2, M.M.2 testified that she heard D.B. tell Defendant Gilfus that he wanted to talk to Defendant Gilfus because there were kids calling him names. (_Id._ at 66.) Again, this is insufficient to create a genuine issue of material fact as to whether Defendant Gilfus had actual notice that D.B. was being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur, a slur relating to gender stereotyping, or a slur relating to disability bias. This is particularly true in light of other allegations Plaintiff made that are not actionable, e.g., referring to D.B. as "welfare" (Dkt. No. 28, at ¶ 5), teasing D.B. for his phone and comparing phones (_id._ at ¶ 114), and the rumor that D.B. was having sex with animals (_id._ at ¶ 130).

[16] Plaintiff disputed this fact and directed the Court to its statement of additional material facts in dispute (Dkt. No. 189, Attach. 8, at ¶ 144), wherein it cited the testimony of Defendant House. Plaintiff cited to page 65 of Defendant House's deposition testimony, which was omitted from the excerpts from Defendant House's deposition submitted by Plaintiff (Dkt. No. 189, Attach. 13) and Defendants (Dkt. No. 179, Attach. 44). In addition, Plaintiff's argument appears

78.  Defendant Warneck never heard D.B.'s name prior to D.B.'s death, and had no knowledge or report of D.B. being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur or a slur relating to gender stereotyping or disability bias.[17]

79.  Six of D.B.'s fellow students and friends (K.S., T.C., S.S., M.M., K.K., and K.M.) did not know of D.B. experiencing *any* bullying or harassment.[18]

80.  Although D.B.'s mother sent several e-mail communications to the principal and the superintendent of schools concerning alleged bullying or harassment of D.B., none made reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.

81.  D.B., his mother, and his father met with the then-superintendent of schools, Joseph Menard, on or about May 20, 2012, to discuss the issues between D.B. and B.B., and recorded the conversation. During the meeting there was not even a single reference to

---

to be an attack on Defendant House's credibility, which as discussed above in footnote 12 of this Decision and Order, is insufficient to establish an issue of fact for trial.

[17]  As set forth above in footnote 2 of this Decision and Order, where a non-movant neither admits nor disputes a fact, the response is deemed an admission. In addition, Plaintiff's answer is non-responsive and does not identify any citation in the record to Defendant Warneck's knowledge of D.B.'s existence prior to his death, that D.B. was being harassed or bullied on the basis of any protected characteristic, or that D.B. had been called an antigay slur or a slur relating to gender stereotyping or disability bias.

[18]  Plaintiff alleges that S.S. was a student known to bully D.B. or had bullied D.B. However, Plaintiff failed to cite to any specific portion of the record where S.S. was identified as bullying D.B.

discrimination, disability bias, gender bias, gender stereotyping bias, or slurs reflecting any of the foregoing.

82. Further, D.B.'s mother drafted a "history" of the alleged friction between D.B. and B.B.

83. D.B.'s mother herself only heard (via hearsay) that D.B. had been called "gay" on one occasion.[19]

84. The one occasion was when D.B. claimed a fellow student, A.M., had called the music D.B. was listening to "gay." The sole admissible evidence, however, is that no such comment was made.[20]

85. D.B.'s mother and father admitted in their depositions that they did not recall whether they or D.B. ever verbally told Defendant Gilfus that D.B. was being called antigay slurs.

86. D.B.'s mother admitted in her deposition that she did not recall whether she, her husband, or D.B. ever told told Defendant Gilfus that D.B. had been subjected to any comment regarding disability, except for the possible hearsay claim set forth below in ¶ 87.

---

[19]    Plaintiff's response to the fact that its sole sources of information regarding this incident are hearsay is that the information would fall under a hearsay exception, but does not provide which exception or any specific citation to the record in denial of the fact. D.B.'s mother's testimony regarding statements made to her by D.B. prior to his death about statements students made to him in school is at least one layer of inadmissible hearsay, and thus, will not defeat Defendants' motion for summary judgment. *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 845 (6th Cir. 2016); *see also Moore v. Chilton Cnty Bd. of Educ.*, 1 F. Supp. 3d 1281, 1301-02 (M.D. Ala. 2014) (finding as inadmissible hearsay student Brandon's testimony regarding school district employee, Ms. Giles' knowledge of the harassment where Brandon testified that three months prior to A.M.'s death, two male classmates told him that Ms. Giles summoned them to her office because A.M. "went to Ms. Giles"); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1335 (M.D. Ga. 2007) (holding that an affidavit by university's dean of student affairs about what male student told him, was inadmissible hearsay).

[20]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that a hearsay exception would be applicable without stating which hearsay exception or providing any specific citation to the record in support thereof is insufficient to establish an issue of fact for trial.

87. D.B.'s mother claimed D.B. told Defendant Gilfus that T.M. had told him to "go back to your doctor." However, she did not clarify whether D.B. made this report in her presence or whether she was relying on hearsay from D.B. that he had made such a report to Defendant Gilfus.

88. The sole admissible evidence regarding whether the underlying comment ("go back to your doctor") was actually made or not is T.M.'s denial that he made the comment.[21]

89. There is no non-hearsay evidence that T.M. actually made the comment that was the subject of the alleged report.[22]

#### D.B. Was Not Subjected to Gender Stereotyping, and Was Not Believed to Be Disabled

90. D.B.'s fellow students, including the students D.B.'s mother accuse of bullying and harassing D.B., did not view him as acting in non-stereotypically-male ways or as disabled.[23]

---

[21] Plaintiff argues that this information would fall under a hearsay exception, but does not provide which exception or any specific citation to the record in denial of the fact. Plaintiff attempts to hide behind D.B.'s mother's deposition testimony and argues that, based on her testimony, it is unclear whether she personally heard D.B. tell Defendant Gilfus about T.M.'s comment or whether D.B. later told her that he told Defendant Gilfus about T.M.'s comment. (Dkt. No. 189, Attach. 7, at ¶ 106.) The Court finds that it is most plausible that D.B.'s mother heard from D.B. that D.B. reported to Defendant Gilfus that T.M. told D.B. to "go back to your doctor." Otherwise, D.B.'s mother would have testified that D.B. told her and Defendant Gilfus about T.M.'s comment, which is not how D.B.'s mother testified. However, viewing the evidence in the light most favorable to Plaintiff for purposes of this motion for summary judgment, and assuming that D.B.'s mother did in fact hear D.B. tell Defendant Gilfus about the incident with T.M., the Court still finds that the statement of T.M. to D.B. and D.B.'s recitation of it to either to his mother or Defendant Gilfus is at least one layer of inadmissible hearsay. Further, Defendant Gilfus testified that he had no knowledge of the incident between T.M. and D.B. (Dkt. No. 179, Attach. 2, at ¶ 8.)

[22] As set forth above in footnote 21 of this Decision and Order, Plaintiff's denial is insufficient to create an issue of fact for trial.

[23] Plaintiff denied this fact and cites to the Second Amended Complaint, which is not verified and thus is not admissible evidence.

91.     Plaintiff claimed in its Complaint that D.B. "fail[ed] to conform to gender stereotypes" and "was never accepted for who he was or what he enjoyed (i.e. gaming, type of music, clothes he wore)."

92.     However, in discovery, Plaintiff provided the following purported basis for those claims:

> D.B. wore a lot of earth toned and camouflaged clothing. He wore t-shirts and sweatshirts from brands such as Gander Mountain, a brand not often worn by the majority of his peers. He was often called "welfare" for the clothes he wore, the Iphone 4 he owned and his Beats Headphones. D.B. listened to music genres such as country, hard rock and "screamo." He enjoyed hobbies such as trapping and hunting. The way he dressed, his hobbies, and the music he listened to were completely adverse [sic] to his fellow male classmates.

93.     D.B.'s "disability" was depression, oppositional defiant disorder, and mood disorder.

### The Alleged Texts of Antigay/Gender Stereotyping Slurs and Insults Not Involving the District

94.     Plaintiff alleged that a large number of slurs and offensive comments were directed at D.B. via text messages received on his cell phone; but almost all of these allegations pertained to texts received outside school hours from individuals with no apparent connection to the District (and who in most cases were apparently not even located in New York State).

95.     Plaintiff alleges that D.B. received a text stating, "Oh, and based on having to deal with your stupidity, if I was locked in a room with living Adolf Hitler, living Osama bin Laden, and you, I'd shoot you twice."

96.     The text was received on February 25, 2014, at 8:44 p.m., outside school hours.

97.     D.B.'s mother has no information as to who the text is from or whether the sender attended school in the District.

98.     The text is presented as coming from a phone number with a 330 area code.

99. The 330 is the area code assigned to the Akron, Ohio area.[24]

100. Plaintiff alleges that D.B. received a text stating, "They all hate u for one two your [sic] note [sic] funny and three your [sic] a queer."

101. The text was received on February 2, 2014, at 1:52 a.m., outside school hours.

102. The text was from an individual presented as "That_Bear99."

103. D.B.'s mother has no information that "That_Bear99" attended school in the District.

104. "That_Bear99" is identified as a Garrett Groves.

105. D.B.'s mother does not know a Garrett Groves.

106. No one named Garrett Groves was a student in the District.[25]

107. In a subsequent text, D.B. referred to the text as being part of an exchange between him and children from southern states who did not go to school with him.

108. Plaintiff alleges that D.B. received a text stating, "What the fuck do u want u fuckig [sic] queer."

109. The text was from the same individual presented as "That_Bear99."

110. The text was received outside school hours.

111. Plaintiff alleges that D.B. received a text stating, "No don't talk to me later. I'm not fucking telling you you [sic] fucking queer!"

112. The text was received outside school hours.

113. The text was from an individual presented as "Angel_Poop."

114. D.B.'s mother has no information that "Angel_Poop" attended school in the District.

---

[24] As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[25] As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

115.    "Angel_Poop" is identified as an Angel Velazquez.

116.    D.B.'s mother does not know an Angel Velazquez.

117.    No one named Angel Velazquez was attending school in the District at that time.[26]

118.    Plaintiff alleges that D.B. received a text stating, "U r very gay."

119.    D.B.'s mother does not know who sent the text.

120.    Plaintiff alleges that D.B. received a text stating, "You fucking homo."

121.    The text was sent on January 31, 2014, at 7:28 p.m., outside school hours.

122.    The text was from an individual presented as "Rebel76er."

123.    D.B.'s mother has no information that "Rebel76er" attended school in the District.

124.    "Rebel76er" is identified as a Lonnie Yancey.

125.    D.B.'s mother does not know a Lonnie Yancey.

126.    No one named Lonnie Yancey was ever a student of the District.[27]

127.    In a subsequent text, D.B. referred to the text as being part of an exchange between him and children from southern states who did not go to school with him.

128.    Plaintiff alleges that D.B. received a text stating, "Hey bitch your [sic] such a waist [sic] of a life you are worthless cunt [sic] ass bitch and go fuck your mom in the ass and I'm gay shit at least I don't fuck the animals that you kill and you can go fuck off she doesn't want anything to do with you because you're a gay faggot cunt bitch you little prick go fall in your moms [sic] ass hole and die faggot ass bitch [sic]."

129.    The text was received on January 31, 2014, at 7:26 p.m., outside school hours.

---

[26]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[27]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

130.    In a subsequent text, D.B. referred to the text as being part of an exchange between him and children from southern states who did not go to school with him.

<u>The Alleged Incident in Elementary School: *The 2004 Mellon Comment*</u>

131.    D.B. attended elementary school (Kindergarten through fifth grade) in the District from 2002 to 2008.

132.    Plaintiff alleges a teacher, Mrs. Mellon, made a derogatory comment to D.B. in October of 2004 (when D.B. was in second grade) (the "2004 Mellon Comment").

133.    The alleged derogatory comment was that he needed to be "smarter than a wall."

134.    The alleged 2004 Mellon Comment occurred approximately six years before 2010, when D.B. was first diagnosed with various disorders and a Committee on Special Education meeting was first held regarding him.[28]

<u>The Alleged Incidents in Middle School</u>

135.    D.B. attended middle school (sixth through eighth grades) in the District from 2008 to 2011, except for a brief period in which he transferred out of the District and then transferred back in.

*The March 2009 Shoving Incident*

136.    Plaintiff alleges that B.B. and D.B. "were involved in a shoving match in the boys' bathroom" (the "March 2009 Shoving Incident").

137.    D.B.'s mother's sole sources of the alleged details of the March 2009 Shoving Incident are her hearsay account of what D.B. supposedly said happened, and her multiple hearsay

---

[28]    As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.

account of what Deborah Percy, the middle school principal, said that D.B. and B.B. told her.[29]

138. In the March 2009 Shoving Incident, it was D.B. who actually started a shoving match with a fellow student, B.B. B.B.'s puppy had recently been hit by a car and killed. In the bathroom, D.B. stated he was glad B.B.'s dog had died, and he shoved B.B. B.B. became angry and shoved D.B. back.[30]

139. The March 2009 Shoving Incident had nothing to do with D.B.'s alleged disability or with gender stereotyping.[31]

140. When D.B.'s mother spoke to B.B.'s mother on the night of the March 2009 Shoving Incident, B.B.'s mother told her that D.B. had said to B.B. "that he was glad [B.B.'s] puppy Bella had gotten killed by a car." D.B.'s mother further explained that D.B. was

---

[29] As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[30] Plaintiff argues that this fact is disputed because of D.B.'s mother's deposition testimony. However, as set forth above in footnote 19 of this Decision and Order, D.B.'s mother's testimony is based on hearsay is inadmissible. (Dkt. No. 179, Attach. 33, at 37-38.) Therefore, the Court will deem this fact admitted.

[31] Plaintiff argues that there is no evidence as to B.B.'s intent. However, B.B.'s affidavit specifically states, "I did not ever call D. names or anything because of any learning disability he may or may not have had. . . . I never viewed D. or the things he liked, as not 'masculine' or as 'homosexual.' I never said anything to D. or did anything to D. based on such belief." (Dkt. No. 179, Attach. 8, at ¶¶ 9-10.) Further, Plaintiff provides no specific record cite in denial of the fact. Plaintiff also seeks to create an issue of fact by arguing that B.B. is not credible because his affidavit is self-serving. As set forth above in footnote 12 of this Decision and Order, an attack on credibility is insufficient to create an issue of fact for trial. In addition, the Court is entitled to consider affidavits or declarations on a motion for summary judgment. Fed. R. Civ. P. 56(c)(4). For reasons unknown to the Court, Plaintiff opted to not depose B.B. pursuant to Fed. R. Civ. P. 30 and Fed. R. Civ. P. 45. Plaintiff will not be permitted to now use that strategic choice as a sword.

"always trying to 'one up' you, always needing to have the last word, and always having

to hit you the hardest with his words."

141.    D.B. and B.B. each were assigned one day of detention for the March 2009 Shoving

Incident.

*Alleged Incident 1*

142.    Plaintiff alleges that, while D.B. was in middle school, a fellow student, B.S., forced him

to lick the bus window and slapped him in the stomach twice ("Alleged Incident 1").

143.    Plaintiff's sole sources of information about Alleged Incident 1 are D.B.'s mother's

hearsay account of what D.B. supposedly said happened and Joseph Hughes' multiple

hearsay account.[32]

144.    D.B.'s mother testified that her basis for claiming Alleged Incident 1 was the product of

gender stereotyping or disability bias is that B.S. supposedly asked D.B. for a cigarette

during the incident, instead of asking girls in the vicinity.

145.    Plaintiff has offered no evidence suggesting that B.S. viewed D.B. as more likely to have

a cigarette than a girl because D.B. was a boy.[33]

---

[32]    Plaintiff argues that this fact is disputed because the information will fall under a hearsay exception without providing which exception or any specific citation to the record. As set forth above in footnote 19 of this Decision and Order, the Court does not find a hearsay exception applicable here. Therefore, the Court will deem this fact admitted.

[33]    Plaintiff disputed this fact and cited to D.B.'s mother's testimony in response to a question regarding another allegation. D.B.'s mother's quoted response was as follows: "By June of 2013, everybody had heard the rumors, he was gay, having sex with his dog. I mean it's just a matter of time before everybody jumps on that train so . . . ." (Dkt. No. 189, Attach. 24, at 108.) This incident was alleged to have happened when D.B. was in middle school, which was from 2008 to 2011. As a result, whether "everyone" knew about these rumors by June 2013 is not relevant to acts that happened two to five years before that time. Therefore, the Court deems this fact admitted. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history is entirely speculative, lacking any facts or allegations that such a connection exists.

146. B.S. left the District when D.B. was still in middle school.

147. There were no further issues reported between D.B. and B.S.[34]

*Alleged Incident 2*

148. Plaintiff alleges B.B. engaged in a course of harassing conduct involving D.B.'s locker and antigay and gender-related slurs while he and D.B. were in middle school ("Alleged Incident 2").

149. Plaintiff's sole source of information concerning Alleged Incident 2 is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[35]

150. D.B.'s mother presented a purported summary of the history between D.B. and B.B. to Ms. Percy.

151. D.B.'s mother's purported summary of the history suggested that any issues between D.B. and B.B. did not relate to gender stereotyping or disability bias.[36]

152. Nevertheless, the middle school principal, Ms. Percy, arranged for D.B.'s locker to be moved away from B.B.'s locker.

---

[34] As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.

[35] Plaintiff argues that this fact is disputed because the information will fall under a hearsay exception without providing which exception or any specific citation to the record. As set forth above in footnote 19 of this Decision and Order, the Court does not find a hearsay exception applicable here. Therefore, the Court will deem this fact admitted.

[36] Plaintiff disputes this fact but provides no citation to the record. In addition, Plaintiff's only response is a double negative statement that "at no time did [D.B.'s mother] elude to the fact that the history between B.B. and D.B. did not relate to gender stereotyping or disability bias." (Dkt. No. 189, Attach. 7, at ¶ 172.) This response is insufficient to create an issue of fact for trial.

153.    Plaintiff alleges that in Spring, 2011, a fellow student, N.B., bullied D.B. ("Alleged Incident 3").

154.    Plaintiff's sole sources of information concerning Alleged Incident 3 are D.B.'s mother's hearsay account of what D.B. supposedly said happened, and her hearsay account of what her other son, M.B., supposedly said happened on the bus.[37]

155.    M.B. denied knowing who N.B. is and denied knowing if N.B. rode the bus with him and D.B.

156.    D.B.'s mother does not remember if D.B. ever reported that N.B. made any reference to D.B.'s disability or gender stereotyping in Spring, 2011.

## The Alleged Incidents in High School

157.    D.B. attended high school (ninth through twelfth grade) in the District from 2011 until his death on March 3, 2014, during his junior year.

### *The Dog Abuse Rumor*

158.    Plaintiff alleges that fellow students spread a rumor that D.B. was engaging in sexual conduct with his dogs (the "Dog Abuse Rumor").[38]

159.    D.B.'s mother alleges that, to her knowledge, this alleged rumor was what D.B. was referring to when he said people were spreading "stupid gay rumours [sic]" about him.

---

[37]    Plaintiff argues that this fact is disputed because the information will fall under a hearsay exception without providing which exception or any specific citation to the record. As set forth above in footnote 19 of this Decision and Order, the Court does not find a hearsay exception applicable here. Therefore, the Court will deem this fact admitted.

[38]    This rumor began either during the 2013-2014 school year or some time starting when D.B. was in eighth grade.

160.     Plaintiff has no evidence that the Dog Abuse Rumor had anything to do with gender stereotyping or disability bias, and cannot even explain how it could involve gender stereotyping or disability bias.[39]

*The May 2012 Lunch Incident*

161.     On or about May 16, 2012, D.B. wrote a note, which he had a third student, W.W., deliver to B.B. The note called B.B. a "little pussy," referred to B.B.'s "little chicken arms," and challenged B.B. to meet D.B. in the boys' bathroom. B.B. did not do so.[40]

162.     On May 17, 2012, D.B. initiated an encounter with B.B. (the "May 2012 Lunch Incident"). D.B. got up from the table he was sitting at during lunch, walked over to the table where B.B. was sitting, and sat next to B.B. D.B. again invited B.B. to fight. B.B. said that, if D.B. wanted to fight, they could meet at a location outside the school, and that, if they did fight, he would "kick [D.B.'s] ass" or words to that effect.[41]

163.     A videorecording of the May 2012 Lunch Incident exists.

---

[39]     As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[40]     Plaintiff denies the characterization of the substance of the note but does not cite to any specific portion of the record in support of that denial.  As set forth above in footnote 14 of this Decision and Order, such a response is insufficient to create an issue of fact for trial.

[41]     Plaintiff denies this fact as asserted and cites solely to the "testimony" of Mrs. Heyman, who witnessed the incident.  However, the Court is unable to locate in the record an affidavit or deposition transcript from Mrs. Heyman.  Further, the document cited by Plaintiff is a combination of handwritten and typed notes dated May 17, 2012, unsigned and unsworn by anyone.  (Dkt. No. 189, Attach. 37.)  Plaintiff includes all its exhibits in its opposition papers unattached to any affidavit, which makes it impossible for the Court to identify Plaintiff's exhibits.  Regardless, the exhibit cited by Plaintiff to support its contention that this fact is disputed is clearly hearsay as well as being unsigned and unsworn.  As a result, the Court deems the fact admitted.

164.    Plaintiff alleges that, during the May 2012 Lunch Incident, B.B. "approached [D.B.] during lunch time and started shouting," and that B.B. "made an aggressive lunging motion toward [D.B.] and told [D.B.] he was going to 'kick the shit' out of him."

165.    The videorecording of the May 2012 Lunch Incident shows D.B. walking over to sit down next to B.B. and engage him in conversation.

166.    The videorecording of the May 2012 Lunch Incident shows that B.B. did not approach D.B.

167.    The videorecording of the May 2012 Lunch Incident shows that B.B. did not make "an aggressive lunging motion" toward D.B.

168.    The videorecording of the May 2012 Lunch Incident does not record B.B. as saying he was going to "kick the shit" out of D.B.[42]

169.    B.B. did not initiate the encounter and it was D.B. who first suggested the two boys should fight.[43]

170.    Plaintiff has no evidence that the May 2012 Lunch Incident had anything to do with gender stereotyping or disability bias.[44]

---

[42]     As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.  Plaintiff also cites to the document discussed above in footnote 41 of this Decision and Order, which is inadmissible and will not be considered by the Court.

[43]     As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.  Plaintiff also cites to the document discussed above in footnote 41 of this Decision and Order, which is inadmissible and will not be considered by the Court.

[44]     D.B.'s mother testified that her basis for believing that this incident had to do with disability bias is because D.B. told her that he told students that he had a history of seeing psychiatrists and psychologists.  (Dkt. No. 179, Attach. 33, at 88-89.)  As set forth above in footnote 19 of this Decision and Order, this testimony is at least one layer of hearsay and is inadmissible.  Moreover, D.B.'s mother's testimony that students engaged in this incident

171. Defendant Gilfus counseled D.B. and B.B. not to engage in conflict with each other or to bother each other.[45]

<em><u>The June 2012 Pencil Lead Incident</u></em>

172. D.B. reported to Deborah Eldridge-Block that on June 1, 2012, several pieces of pencil lead landed on his shoulder, in his hair, and on the paper on his desk during a practice Regents Examination (the "June 2012 Pencil Lead Incident"). He stated that he did not know who had thrown the lead pieces but that he believed it was B.B.

173. The District's investigation showed that B.B. and another student, A.B., were throwing small objects back and forth at each other, not at D.B.

174. B.B. and A.B. had no intention of hitting D.B. with anything.[46]

175. Plaintiff alleges that, during the June 2012 Pencil Lead Incident, B.B. threw things intending to hit D.B.

176. Plaintiff's sole information regarding the June 2012 Pencil Lead Incident is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[47]

---

because they knew of D.B.'s mental health history is entirely speculative, lacking any facts or allegations that such a connection exists.

[45] As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[46] As set forth above in footnote 14 of this Decision and Order, Plaintiff's argument that this fact is disputed without a specific citation to the record setting forth the basis for the dispute is insufficient to create an issue of fact for trial.

[47] As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

177. Defendant Gilfus directed all faculty working with D.B. and B.B. that the two boys were to be on opposite sides of the room during testing at all times.[48]

178. He also requested that the school guidance counselor, Ms. Nevala, make sure D.B. and B.B. were not scheduled in any periods together for the remainder of their high school careers.[49]

179. B.B. and D.B. did not have classes together again after that.

180. B.B.'s locker was also moved away from D.B.'s locker, and their lockers were never next to each other again.[50]

181. D.B. passed the actual examination for which he had been taking a practice exam during the June 2012 Pencil Lead Incident.

### *The June 2012 Gum Wrapper Incident*

182. On or about June 7, 2012, a fellow student, T.M., threw a gum wrapper to get D.B.'s attention (the "June 2012 Gum Wrapper Incident"). He later wrote a note explaining that he had simply been trying to get D.B.'s attention.[51]

---

[48] As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[49] As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[50] As set forth above in footnote 2 of this Decision and Order, where a non-movant neither admits nor disputes a fact, the response is deemed an admission. In addition, after some discussion, Plaintiff states that it is undisputed that, after 2012, B.B. and D.B.'s lockers were not located next to one another.

[51] As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.

183.  Plaintiff has no evidence that the June 2012 Gum Wrapper Incident had anything to do with disability bias.[52]

184.  Plaintiff alleges that, during the June 2012 Gum Wrapper Incident, T.M. and other students, including B.B., told D.B. he was "too much of a 'pussy' to kill himself."

185.  D.B.'s mother, however, admits she has no basis to believe that statement occurred and that the Complaint is simply incorrect in alleging that it did.[53]

186.  No such comment was in fact made during this incident.[54]

187.  Plaintiff's Complaint also alleges that, during the June 2012 Gum Wrapper Incident, students called D.B. "gay."

188.  Plaintiff's sole information that a student called D.B. "gay" during the June 2012 Gum Wrapper Incident is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[55]

---

[52]  Plaintiff argues that this incident was motivated by a disability bias because students knew that D.B. was seeing doctors, called him stupid, and thought he was stupid.  (Dkt. No. 179, Attach. 33, at 90.)  As set forth above in footnote 44 of this Decision and Order, D.B.'s mother testified that D.B. told her that he told students that he had a history of seeing psychiatrists and psychologists, which is how D.B.'s mother knew that other students knew of D.B.'s mental health history.  (Dkt. No. 179, Attach. 33, at 88-89.)  As set forth above in footnote 19 of this Decision and Order, D.B.'s mother's testimony is at least one layer of hearsay and is inadmissible.  Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history is entirely speculative, lacking any facts or allegations that such a connection exists.

[53]  As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.  Also, as set forth above in footnote 2 of this Decision and Order, Plaintiff failed to admit or deny this asserted fact, so the Court will deem it as admitted.

[54]  As set forth above in footnote 4 of this Decision and Order, Plaintiff's response stating that this fact is undisputed then including facts tending to disprove it is improper and thus this fact will be deemed admitted.

[55]  As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific

189. The alleged use of the term "gay" was not reported to the District in connection with the June 2012 Gum Wrapper Incident.[56]

*The September 2012 Hair Spray Incident*

190. In September, 2012, a fellow student, H.S., was disciplined for spraying hair spray that got in D.B.'s eyes (the "September 2012 Hair Spray Incident").[57]

191. There is no evidence that the September 2012 Hair Spray Incident had anything to do with gender stereotyping or disability bias, or that it was even misconduct intentionally directed at D.B.[58]

192. Nevertheless, Defendant Gilfus gave H.S. two days of detention for "Dangerous/Reckless Behavior."

193. There were no further issues reported between H.S. and D.B.

---

citation to the record is insufficient to create an issue of fact for trial. Plaintiff also attacks the affidavits of T.M. and B.B. as "self-serving." As set forth above in footnote 12 of this Decision and Order, Plaintiff's attack on the credibility of T.M. and B.B. is insufficient to create an issue of fact for trial.

[56] Plaintiff's response that this asserted fact is "disputed as to hearsay," is non-responsive. Defendants do not rely on any hearsay with regard to this fact. Further, Plaintiff does not cite to any specific portion of the record to support such dispute. As such, the Court deems this fact admitted.

[57] Plaintiff disputes this fact as to H.S.'s intent. However, the fact asserted does not make any factual assertion about H.S.'s intent. *See, supra,* footnote 4 of this Decision and Order. Plaintiff also disputes that H.S. was disciplined for spraying hair spray that got in D.B.'s eyes. Yet, Plaintiff's recitation of this incident also provides that H.S. sprayed hair spray and some or all of that hair spray got into D.B.'s eyes. Therefore, the Court will deem this fact admitted.

[58] Plaintiff disputes this fact because a letter that was sent to H.S.'s parents states that Defendant Gilfus did not determine H.S.'s intent. (Dkt. No. 189, Attach. 41, at 8.) However, the asserted fact is merely that there is no evidence that the misconduct (H.S.'s act of spraying the hair spray that got in D.B.'s eyes) was intentionally directed at D.B., which is precisely what the citation provided by Plaintiff states. The citation provided by Plaintiff does not dispute this fact as asserted.

## *The December 2012 Binder Incident*

194.    In December, 2012, an incident occurred involving D.B. and a fellow student, S.S. (the "December 2012 Binder Incident"). During a class, D.B. reached over and smeared S.S.'s notes with his hand. S.S. took D.B.'s pencil, but gave it back, warning D.B. not to smear his notes again. D.B. nevertheless did it again. S.S. then took D.B.'s pencil and broke it. When they stood up to leave at the end of the period, D.B. took S.S.'s binder. S.S. demanded the binder back, but D.B. refused. As a result, S.S. pushed him. He then followed D.B. down the hall and down the stairs to D.B.'s locker, demanding the return of the binder, but did not push D.B. again. D.B. punched S.S. in the face, knocking his glasses off. S.S. picked up his glasses and left.[59]

195.    Plaintiff's sole information regarding the December 2012 Binder Incident is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[60]

196.    There is no evidence that the December 2012 Binder Incident had anything to do with gender stereotyping or disability discrimination.[61]

---

[59]    Plaintiff disputes this fact and cites to the Second Amended Complaint. As set forth above in footnote 23 of this Decision and Order, the Second Amended Complaint is not verified and is thus not admissible evidence. Plaintiff also cites to testimony from M.M.2 about another incident between D.B. and S.S. As set forth above in footnote 4 of this Decision and Order, the response to Defendants' Statement of Material Facts is not the proper place for such additional facts. *See* N.D.N.Y. L.R. 7.1(a)(3) ("To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required to do so in separately numbered paragraphs.").

[60]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[61]    Plaintiff cites to J.B.'s affidavit to dispute this fact and argues that "several" individuals called D.B. "gay" and "faggot" on a daily basis. (Dkt. No. 189, Attach. 7, at ¶ 226.) However, J.B.'s affidavit mentions neither S.S. nor recites any incident even somewhat similar in nature to the December 2012 Binder Incident. (*See generally* Dkt. No. 189, Attach. 4.) Therefore, Plaintiff failed to identify any specific citation in the record that disputes this fact. Plaintiff also

197. No report of the December 2012 Binder Incident was made until months later.

198. Defendant Gilfus investigated the matter when it was brought to his attention, by interviewing D.B. and S.S. He concluded D.B. was the aggressor and instigator. However, because the incident had happened so long before the report came to him, he determined not to impose discipline.[62]

### The January 2013 A.M. Bus Incident

199. On January 25, 2013, an incident occurred involving D.B. and a fellow student, A.M. (the "January 2013 A.M. Bus Incident"). D.B. was on the school bus with his headphones down around his neck and music playing so loud the other students on the bus could hear it. A fellow student, A.M., asked D.B. to turn the music down. D.B. refused. A.M. began sending a text on his phone, at which point D.B., kicked the phone out of A.M.'s hands. A.M. reached for D.B.'s headphones in retaliation, and D.B. reared back in his seat and kicked A.M. in the face, giving A.M. a bloody nose.[63]

---

cites to D.B.'s mother's testimony regarding students knowing D.B.'s mental health history. As set forth above in footnote 44 of this Decision and Order, Plaintiff's argument that students knew of D.B.'s mental health history is hearsay. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history is entirely speculative, lacking any facts or allegations that such a connection exists. Such a speculative, unsupported allegation is insufficient to create an issue of fact for trial.

[62] As set forth above in footnote 5 of this Decision and Order, Plaintiff's response disputing this fact is insufficient for two reasons: (1) it appears that Plaintiff is claiming a lack of personal knowledge, which, as discussed above in footnote 2 of this Decision and Order, is insufficient; and (2) Plaintiff alludes to a need for additional discovery but does not make the requisite showing for more as required by Fed. R. Civ. P. 56(d).

[63] Plaintiff disputes this fact and directs the Court to certain paragraphs of its statement of additional material facts in dispute. (Dkt. No. 189, Attach. 7, at ¶ 229.) Plaintiff's statement of additional material facts in dispute cites to the following seven sources: (1) D.B.'s mother's deposition; (2) B.H.'s affidavit; (3) "Handwritten Notes from incident between D.B. and A.M." that are unsworn, unsigned, and undated; (4) the Second Amended Complaint; (5) Defendant Gilfus' affidavit; (6) D.B.'s mother's e-mails with the District; and (7) the deposition of M.M.2 discussing an additional incident between D.B. and A.M. It is undisputed that, of those

200. D.B. himself stated in a text that A.M. "punched my beats [headphones] cause [sic] I kicked his phone" and that after he struck A.M., "he was bleeding everywhere."[64]

201. When D.B. reared back in his seat to kick A.M., his headphones fell off his neck and hit the bus floor, cracking the band.

202. Plaintiff alleges that the January 2013 A.M. Bus Incident involved A.M. "bullying" D.B. on the school bus. In particular, Plaintiff alleges that A.M. called D.B.'s music "gay" and that D.B. kicked A.M. because A.M. had his fist cocked back to punch D.B.

203. A.M. did not call D.B.'s music "gay" and did not make a fist at any point.[65]

204. Plaintiff's sole information concerning the January 2013 A.M. Bus Incident is D.B.'s mother's hearsay accounts of what D.B. and M.B. supposedly said happened, as well as her hearsay accounts of hearsay accounts relayed by two non-witnesses to the events (i.e., Mr. Gilfus and the District's transportation director).[66]

---

sources listed above, B.H. is the individual who was present for the January 2013 A.M. Bus Incident, thus the other sources all constitute inadmissible hearsay. B.H. testified that "A.[M.] instigated an altercation where he tried to grab D.[B.]'s headphones off of him and D.[B.] kicked A.[M.] in the face. A.[M.] called D.[B.] a 'dog fucker' multiple times to his face during that altercation and on other occasions as well." (Dkt. No. 189, Attach. 3, at ¶ 7.) The Court does not read B.H.'s affidavit as contrary to this fact as asserted; instead the Court finds it complimentary.

[64] Plaintiff states that this fact is undisputed as to what the text message states but disputed as to whether the text is inclusive of all the facts, again citing to her statement of additional material facts in dispute and the deposition of D.B.'s father, Robbie Briggs. (Dkt. No. 189, Attach. 7, at ¶ 230.) As set forth above in footnote 63 of this Decision and Order, and because it is undisputed that Robbie Briggs was not present for the January 2013 A.M. Bus Incident, the Court finds that Plaintiff's citations to the record fail to dispute the fact as asserted.

[65] Plaintiff disputes this fact and again cites to its statement of additional material facts in dispute. As set forth above in footnote 63 of this Decision and Order, of the sources cited by Plaintiff, there is no non-hearsay, admissible source regarding the January 2013 A.M. Bus Incident to support the allegation that A.M. called D.B. gay or made a fist towards D.B.

[66] As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific

205.    When M.B. testified at deposition, he recited what he heard in the verbal exchange between A.M. and D.B., which did not include any antigay slurs or even any insults, and he confirmed that he had described in his testimony everything he remembered hearing the two boys say.

206.    The sole non-hearsay evidence–A.M.'s, M.B.'s, and M.H.'s sworn accounts–is that A.M. did not, in fact, use the term "gay" during the January 2013 A.M. Bus Incident.[67]

207.    Further, when M.B. testified at his deposition, he described A.M. as reaching for D.B.'s headphones, not trying to punch D.B., and admitted that he did not remember whether A.M.'s hand was open or closed.

208.    There is no admissible evidence establishing that the January 2013 A.M. Bus Incident had anything to do with gender stereotyping or disability bias; Plaintiff's claim that it did is based not merely on hearsay but on hearsay not supported by the actual witnesses.[68]

209.    Based on his investigation, which included interviews of students who were present on the bus, Defendant Gilfus concluded that Plaintiff's allegation that this incident was motivated by gender stereotyping was unfounded.

---

[67]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial. Plaintiff also attacks the affidavit of A.M. referring to it as "self-serving." As set forth above in footnote 12 of this Decision and Order, Plaintiff's attack on the credibility of A.M. is insufficient to create an issue of fact for trial.

[67]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial. Plaintiff also attacks the affidavit of A.M. referring to it as "self-serving." As set forth above in footnote 12 of this Decision and Order, Plaintiff's attack on the credibility of A.M. is insufficient to create an issue of fact for trial.

[68]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

210.   D.B. received two days' detention for the January 2013 A.M. Bus Incident.

211.   Defendant Gilfus also counseled the two boys regarding the January 2013 A.M. Bus Incident.

### *The January 2013 A.M. Threat Incident*

212.   As A.M. left the bus with a bloody nose, he promised D.B. that he would "get" D.B. at a future time. He later reiterated his intent to retaliate against D.B. during a conversation with Defendant Gilfus (the "January 2013 A.M. Threat Incident").

213.   Defendant Gilfus counseled A.M. against any retaliation for D.B. kicking him in the face and giving him a bloody nose.

214.   A.M. did not retaliate against D.B.

215.   There were no further incidents between D.B. and A.M.

### *Alleged Incident 4*

216.   After the A.M. Bus Incident, D.B.'s headphones had a crack in the band that went over the wearer's head.

217.   The headphones would still carry music and would still stay on D.B.'s head or neck despite the crack.

218.   Plaintiff alleges that N.B. told D.B. that his headphones weren't really broken ("Alleged Incident 4").

219.   Plaintiff alleges that, by supposedly telling D.B. his headphones weren't really broken, N.B. "verbally harassed" D.B. regarding "the type of headphones D.B. owns."[69]

---

[69]   As set forth above in footnote 2 of this Decision and Order, where a non-movant neither admits nor disputes a fact, the response is deemed an admission.

220. Plaintiff's sole information concerning Alleged Incident 4 is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[70]

<em>Alleged Incident 5</em>

221. Plaintiff alleges that on January 28, 2013, a fellow student, M.H., threw various items at D.B. on the school bus "[i]n retaliation for the bus incident between [D.B.] and A.M." ("Alleged Incident 5").

222. M.H. did not throw anything at D.B. on the bus or otherwise.[71]

223. Plaintiff has never advanced any non-hearsay evidence that Alleged Incident 5 occurred.[72]

<em>The 2013 Suicide Text Incident</em>

224. Plaintiff alleges that, approximately a year before D.B.'s death, T.M. sent D.B. a text stating that D.B. was "too much of a pussy" to kill himself and/or that D.B. should "take one of your precious guns and do the world a favor–go kill yourself," or words to that effect (the "2013 Suicide Text Incident").

---

[70]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[71]    In response to this fact, Plaintiff directs the Court to its statement of additional material facts in dispute, where it cites to D.B.'s mother's correspondence with the District regarding this incident.  D.B.'s mother's correspondence includes a recitation of what D.B. told her about Alleged Incident 5.  (Dkt. No. 189, Attach. 27, at 12.)  As set forth above in footnote 19 of this Decision and Order, this is at least one layer of hearsay and is inadmissible for purposes of this motion for summary judgment.  Lacking any specific citation to the record of admissible evidence, the Court deems this fact admitted.

[72]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

225.  D.B.'s mother recalls the text as having been sent on a weekend, i.e., outside of school hours.

226.  M.M.2 also claimed that, D.B. showed her a text sent at some point, by T.M. stating that D.B. should "take one of your precious guns and kill yourself."

227.  No such text appears either in the Cellebrite Text Report prepared by the New York State Police or in the report prepared by Kessler International.

228.  M.M.2 did not report this incident to any staff member or teacher and did not witness anyone report it.

229.  The 2013 Suicide Text Incident was not reported to the District.

230.  The District had no knowledge of the alleged 2013 Suicide Text Incident prior to D.B.'s death.[73]

*Alleged Incident 6*

231.  Plaintiff alleges that, approximately a year before D.B.'s death, an unidentified fellow student or students told him he was a "psycho" and/or that he needed to "go see a shrink," or words to that effect ("Alleged Incident 6").

232.  In separate testimony, D.B.'s mother claimed D.B. said T.M. told him he needs to "go back to your doctor" comment.

233.  Plaintiff's sole information concerning Alleged Incident 6 is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[74]

---

[73]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[74]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

234. Alleged Incident 6 was never reported to the District by D.B. or anyone else.[75]

235. The District had no knowledge of Alleged Incident 6 prior to the filing of the

Complaint.[76]

*The March 2013 N.B. Orange Peel Incident*

236. Plaintiff alleges that in March, 2013, N.B. was throwing orange peels at D.B. in the

lunchroom, when some of the orange peels hit T.M. N.B. stated, "Sorry, T.M., I meant to

hit [D.B.]." D.B. was actually hit by the orange peels.

237. Plaintiff's sole information that N.B. was trying to hit D.B. (rather than T.M., the student

he actually hit) during the March 2013 N.B. Orange Peel Incident is D.B.'s mother's

---

[75]     Plaintiff disputes this fact and cites to M.M.2's testimony that she saw D.B. report to the office multiple times and tell Defendant Gilfus that he needed to talk because students were calling him names. (Dkt. No. 189, Attach. 7, at ¶ 266.) Taking M.M.2's testimony as true, the Court finds that the statement still does not establish that Defendant Gilfus had actual knowledge that students were calling D.B. a "psycho" and saying that he needed to see a shrink or go back to his doctor. Plaintiff also cites to Defendant Gilfus' Annual Professional Performance Review, which states that Defendant Gilfus needed to "maintain formal and informal records on students, parents and staff. The district does not want to be in another situation like the Briggs looking for notes that were sent to the school but not kept." (Dkt. No. 189, Attach. 43, at 10.) However, as explained by the affidavit of Defendant House, the statement in Defendant Gilfus' Annual Professional Performance Review regarding "the need to keep a log of complaints received from parents or students regarding issues other than student discipline . . . originated with Plaintiff's claim that although [D.B.'s mother] made complaints to Mr. Gilfus about student disciplinary issues involving D.B., there were no records in his student file concerning the same. I recognized that records pertaining to parent or student complaints about student discipline would be in 'SchoolTool' software used by the District, so I expressly limited the log requirement to issues 'other than student disciplinary issues.' It was intended to reinforce the existing rule, and was not included because I had any information that Mr. Gilfus had actually failed to keep records of non-discipline-related complaints." (Dkt. No. 194, Attach. 5, at ¶ 10.) Further, there is no allegation made by Plaintiff currently before the Court that D.B.'s mother or anyone else reported Alleged Incident 6 to the Defendants or their representatives prior to D.B.'s death.

[76]     Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

hearsay account of what D.B. supposedly said happened, and her hearsay account of Defendant Gilfus' multiple hearsay account.[77]

238.    Defendant Gilfus interviewed N.B., T.M., and D.B., and concluded that N.B. had in fact been trying to hit T.M., the student who actually was struck by the orange peel. He counseled N.B. not to throw things.

<em>Alleged Incident 7</em>

239.    Plaintiff alleges that in March, 2013, N.B. threw items at D.B. on the school bus ("Alleged Incident 7").

240.    No report was ever made that N.B. had thrown items at D.B. on the school bus.[78]

<em>The June 2013 Fight Incident</em>

241.    On June 11, 2013, D.B. and J.R. texted each other during the school day to arrange a fight. The texts showed it was a mutual decision to fight.

242.    In fact, D.B. said in a text that J.R. "told me not to talk about him and I got pissed, set up a fight, and beat te [sic] shit out of him to where the principle [sic] jumped on me and had to hold me down."

243.    On June 11, 2013, D.B. and J.R. fought outside the school near the area where the afternoon buses were waiting (the "June 2013 Fight Incident").

244.    Plaintiff alleges that in the June 2013 Fight Incident, J.R. "jumped" D.B.

---

[77]    As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[78]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

245.  Plaintiff has no information that the June 2013 Fight Incident had anything to do with gender stereotyping or disability bias.[79]

246.  D.B. received three days' suspension, while J.R. received five days' suspension because he was found to have tobacco on his person.

*The September 2013 Neck-Poking Incident*

247.  On September 23, 2013, an incident occurred between D.B. and a fellow student, C.T. (the "September 2013 Neck-Poking Incident"). During lunch, D.B. poked C.T. in the neck multiple times with a pencil, without C.T. doing anything to provoke D.B. (in particular, without C.T. first talking to D.B. or even looking at him). C.T. told D.B. to stop but D.B. refused to stop. D.B. poked C.T. so hard he drew blood in two places. C.T. then punched D.B. in the face.[80]

248.  Defendant Gilfus observed a videorecording of the September 2013 Neck-Poking Incident. It showed D.B. poking C.T. in the neck with a pencil without any apparent provocation (and, in particular, without C.T. first talking to D.B. or even looking at him); C.T. telling D.B. to stop, D.B. continuing, and finally C.T. punching D.B.[81]

---

[79]     As set forth above in footnote 44 of this Decision and Order, Plaintiff's argument that students knew of D.B.'s mental health history and rumors about his sexual orientation is hearsay. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history and/or sexual orientation is entirely speculative, lacking any facts or allegations that such a connection exists. Such a speculative, unsupported allegation by Plaintiff is insufficient to create an issue of fact for trial.

[80]     In opposition, Plaintiff directs the Court to its Statement of Disputed Material Facts, where it cites to D.B.'s mother's correspondence with the District. (Dkt. No. 189, Attach. 27, at 16.) It is undisputed that D.B.'s mother's account of the incident with C.T. is based on what D.B. told her about the incident. As set forth above in footnote 19 of this Decision and Order, D.B.'s mother's account of what D.B. told her that C.T. said to him is at least one layer of hearsay and is inadmissible.

[81]     Plaintiff's response disputing this fact is insufficient. Plaintiff seems to argue on one hand that it has possession of the video and knows what the video depicts, in which case

249. Plaintiff alleges the September 2013 Neck-Poking Incident began when C.T. engaged in name-calling against D.B., leading to D.B. poking C.T. in the neck with a pencil, and then C.T. punching D.B.

250. Plaintiff's sole information concerning the September 2013 Neck-Poking Incident is D.B.'s mother's hearsay account of what D.B. supposedly said happened and multiple hearsay descriptions of alleged comments by Defendant Gilfus.[82]

251. C.T. received out-of-school suspension ("OSS") for his role in the Neck-Poking Incident. However, D.B. received only in-school suspension ("ISS").

252. Plaintiff has no information suggesting the September 2013 Neck-Poking Incident had anything to do with gender stereotyping or disability bias. In particular, D.B.'s mother testified that she does not remember if D.B. ever told her that C.T. used any antigay slurs.[83]

*Alleged Incident 8*

253. Plaintiff alleges that in October, 2013, C.T. resumed making comments to D.B. ("Alleged Incident 8").

---

production by Defendants is not required. In the alternative, if Plaintiff does not have access to the video, then its opposition still fails because a non-movant cannot claim inadequate discovery without satisfying the requirements set forth in Fed. R. Civ. P. 56(d).

[82] D.B.'s mother admits that the source of her information is from what D.B. relayed to her. As set forth above in footnote 19 of this Decision and Order, this constitutes at least one layer of hearsay and is inadmissible.

[83] As set forth above in footnote 44 of this Decision and Order, Plaintiff's argument that students knew of D.B.'s mental health history and rumors about his sexual orientation is hearsay. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history and/or sexual orientation is entirely speculative, lacking any facts or allegations that such a connection exists. Such a speculative, unsupported allegation by Plaintiff is insufficient to create an issue of fact for trial.

254. Defendant Gilfus consulted with C.T., who advised that he had not, in fact, made any comments to D.B., and was continuing not to sit at D.B.'s table or to speak to him during lunch as instructed. There was no evidence to the contrary beside D.B.'s word that was brought to Defendant Gilfus' attention.[84]

255. Plaintiff's sole information concerning Alleged Incident 8 is D.B.'s mother's hearsay account of what D.B. supposedly said happened.[85]

256. There were no further incidents involving D.B. and C.T.

### *Alleged Incident 9*

257. Plaintiff has alleged that R.J., C.B., and T.G.2 engaged in harassment or bullying of D.B. at unspecified times in high school ("Alleged Incident 9").

258. No one ever reported to Defendant Gilfus that R.J., C.B., or T.G.2 had harassed or bullied D.B.[86]

259. Indeed, neither D.B.'s mother nor D.B.'s father identified R.J., C.B., or T.G.2 when asked to identify the students who bullied, harassed, or discriminated against D.B.

### *Alleged Incident 10*

---

[84] Plaintiff disputed this fact and cited to D.B.'s mother's e-mail correspondence with Defendant Gilfus. D.B.'s mother's source of information in her e-mails regarding Alleged Incident 8 are what D.B. told her. As set forth above in footnote 19 of this Decision and Order, D.B.'s mother's unsworn, unsigned electronic communication regarding what D.B. told her is at least one layer of inadmissible hearsay.

[85] As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[86] Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

260. Plaintiff alleged that, "[i]n the days leading up to his death, [D.B.] was held down by a group of boys in the locker room while they took his cell phone and texted a girl, 'I'm gay'" ("Alleged Incident 10").

261. Plaintiff's sole source of information concerning Alleged Incident 10 was a multiple hearsay account from the mother of D.B.'s fellow student, K.M., who had supposedly heard the story from K.M.[87]

262. K.M. did not actually witness any such incident; he only heard other students talking about a supposed incident in the locker room. He believes part of the story he heard involved a text being sent out, but does not recall the story being that the text was "I'm gay."

263. Although the incident supposedly occurred a day or two before D.B. died, no such text appears either in the Cellebrite Text Report or the Kessler Investigation Report.

264. Alleged Incident 10 was never reported to the District.[88]

**The Reports that Were Made by D.B.'s Mother and Her Husband Patently Did Not Suggest Harassment or Bullying Based on Gender Stereotyping, Disability, or the Perception that D.B. Was Disabled**

265. Defendants, in an interrogatory, sought specificity as to what the "Briggs Family brought . . . to the attention of the school" as alleged in the Second Amended Complaint, including when, to whom, and how the matter was "brought . . . to the attention of the school."

---

[87] As set forth above in footnote 19 of this Decision and Order, Plaintiff's response that the information will fall under a hearsay exception without providing which exception or a specific citation to the record is insufficient to create an issue of fact for trial.

[88] Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

266. Plaintiff listed twenty-seven instances in which issues were purportedly brought to the attention of employees or officers of the District, either verbally or in writing.

267. The first purported report concerned the 2004 Mellon Comment, as set forth above in ¶ 134, was made approximately six years before 2010, when D.B. was diagnosed with various disorders.

268. The second purported report, dated September 28, 2009, was an e-mail that contained no reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that any alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[89]

269. The third purported report, dated September 29, 2009, concerned Alleged Incident 1.

270. There is no admissible evidence that Alleged Incident 1 occurred, and no evidence that it concerned any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[90]

271. The fourth purported report, issued during the 2009-2010 school year, involved a discussion between D.B.'s mother and Ms. Percy of the issues between D.B. and B.B. (including the March 2009 Shoving Incident), and D.B.'s mother's submission of a

---

[89]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

[90]    Plaintiff argues that the information would not constitute hearsay and even if it did it would fall under a hearsay exception, but fails to provide any specific citation to the record or identify which hearsay exception would be applicable. As set forth above in footnote 19 of this Decision and Order, D.B.'s mother's testimony regarding what D.B. told her is at least one layer of inadmissible hearsay.  Plaintiff directs the Court to Plaintiff's Response to Defendants' Material Fact.  (Dkt. No. 189, Attach. 8, at ¶ 306.)  Plaintiff's response provides the same or substantially the same response as the Court discussed above in footnote 75 of this Decision and Order.

document describing the conflict between the boys. D.B.'s mother admitted she did not remember if she ever described any antigay or other slurs used by B.B. in her verbal discussion with Ms. Percy.

272.     D.B.'s mother's written account of the alleged "history" between D.B. and B.B. did not portray the issues between the two boys as based on a disability or perceived disability of D.B., gender discrimination, or gender stereotyping. It mentioned exactly one instance in the many-year-history that B.B. allegedly used an antigay slur–when in middle school B.B. called D.B. a "bigger faggot than you were before" for requesting a new lock for his locker.[91]

273.     B.B. did not make the alleged comment, and there is no admissible evidence that he did.[92]

274.     The fifth purported report, dated December 22, 2009, was an e-mail objecting to D.B. being paired with B.B. for a class project. It contained no reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[93]

---

[91]     Plaintiff cites to D.B.'s mother's testimony regarding her concern about D.B.'s emotional well-being and identifies that she described B.B. as a "bully" in her written account of the history between D.B. and B.B.  None of these arguments negate the fact as stated.

[92]     As set forth above in footnote 19, D.B.'s mother's testimony regarding what D.B. told her that B.B. said to him is at least one layer of inadmissible hearsay.  Moreover, as set forth above in footnote 12 of this Decision and Order, Plaintiff's argument that B.B.'s affidavit is self-serving is insufficient to create a genuine issue of material fact for trial.

[93]     Plaintiff stated that this fact was undisputed.  However, Plaintiff then said this fact was disputed as to that there was no report of discrimination.  Plaintiff provides no record citation to support its argument that a report of discrimination was made.

275.     The sixth purported report, dated January 20, 2011, was an e-mail concerning Alleged

         Incident 3. It contained no reference to any disability or perceived disability of D.B.,

         gender discrimination, gender stereotyping, antigay slurs, or any other indication that the

         alleged bullying and harassment was due to discrimination on the basis of a protected

         characteristic.[94]

276.     The seventh purported report, dated May 17, 2012, was telephone conversations with

         Defendant Gilfus concerning the May 2012 Lunch Incident. The May 2012 Lunch

         Incident did not involve any reference to any disability or perceived disability of D.B.,

         gender discrimination, gender stereotyping, antigay slurs, or any other indication that the

         alleged bullying and harassment was due to discrimination on the basis of a protected

         characteristic.[95]

277.     The eighth purported report, dated May 20, 2012, was a meeting with then

         Superintendent of Schools Joseph Menard concerning the May 2012 Lunch Incident. It

         did not involve any reference to any disability or perceived disability of D.B., gender

         discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged

         bullying and harassment was due to discrimination on the basis of a protected

         characteristic.[96]

---

[94]     Plaintiff provides the same or substantially the same response as the Court discussed
above in footnote 93 of this Decision and Order.

[95]     Plaintiff provides the same or substantially the same response as the Court discussed
above in footnote 93 of this Decision and Order.

[96]     Plaintiff provides the same or substantially the same response as the Court discussed
above in footnote 93 of this Decision and Order.

278.    The ninth purported report, dated May 22, 2012, was a follow-up telephone conversation

with Mr. Menard concerning the May 2012 Lunch Incident. It did not involve any

reference to any disability or perceived disability of D.B., gender discrimination, gender

stereotyping, antigay slurs, or any other indication that the alleged bullying and

harassment was due to discrimination on the basis of a protected characteristic.[97]

279.    The tenth purported report, dated May 24, 2012, was an e-mail to Mr. Menard regarding

Defendant Gilfus' "plan of action" with respect to the issues between D.B. and B.B. It

did not contain any reference to any disability or perceived disability of D.B., gender

discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged

bullying and harassment was due to discrimination on the basis of a protected

characteristic.[98]

280.    The eleventh purported report, dated May 30, 2012, was a further e-mail to Mr. Menard

regarding Defendant Gilfus' plan of action. It did not contain any reference to any

disability or perceived disability of D.B., gender discrimination, gender stereotyping,

---

[97]    Plaintiff cited to D.B.'s mother's testimony regarding meetings and conversations she
had with Defendant Gilfus.  (Dkt. No. 179, Attach. 33, 161:17-22.)  The report contemplated in
this asserted fact is a telephone conversation with Defendant Menard.  Thus, D.B.'s mother's
statements to Defendant Gilfus do not contradict Defendants' asserted fact that D.B.'s mother
did not reference to any disability or perceived disability of D.B., gender discrimination, gender
stereotyping, antigay slurs, or provide any other indication that the alleged bullying and
harassment was due to discrimination on the basis of a protected characteristic, in her telephone
conversation with Defendant Menard on May 22, 2012.

[98]    Plaintiff provides the same or substantially the same response as the Court discussed
above in footnote 93 of this Decision and Order.

antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[99]

281.  The twelfth purported report, dated May 31, 2012, was yet another e-mail to Mr. Menard regarding Defendant Gilfus' plan of action. It did not contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[100]

282.  The thirteenth purported report, dated June 3, 2012, was an e-mail concerning the June 2012 Pencil Lead Incident. The June 2012 Pencil Lead Incident did not involve, and the email did not contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[101]

283.  The fourteenth purported report, dated June 4, 2012, was an e-mail to Mr. Menard again concerning the June 2012 Pencil Lead Incident. It did not contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping,

---

[99]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[100]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[101]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.  In addition, as set forth above in ¶ 176 of this Decision and Order, Plaintiff's account of what happened during the June 2012 Pencil Lead Incident is hearsay and is inadmissible.

antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[102]

284. The fifteenth purported report, dated June 10, 2012, was an e-mail to Defendant Gilfus concerning the June 2012 Gum Wrapper Incident. There is no admissible evidence that the June 2012 Gum Wrapper Incident involved, and the e-mail did not make any reference to, any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[103]

285. The sixteenth purported report, dated June 11, 2012, was an e-mail to Mr. Menard and Mr. Gilfus concerning the June 2012 Gum Wrapper Incident. The e-mail did not make any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[104]

286. The seventeenth purported report, dated November 15, 2012, was a combination of conferences, telephone conversations, and an e-mail concerning D.B. being marked absent for Student Learning Opportunities ("SLOs"). There is no evidence, or even any

---

[102]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[103]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.  Plaintiff also argues that D.B.'s mother's testimony regarding what D.B. told her would not constitute hearsay or would fall under a hearsay exception without providing which exception or any specific citation to the record.  As set forth above in footnote 19 of this Decision and Order, the Court finds that D.B.'s mother's testimony constituted at least one layer of inadmissible hearsay.

[104]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

claim, that the issue concerned any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the SLO issue was due to discrimination on the basis of a protected characteristic. Nor did the e-mail contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the SLO issue was due to discrimination on the basis of a protected characteristic.[105]

287.    The eighteenth purported report, dated January 28, 2013, was an e-mail to Defendant Gilfus concerning the January 2013 A.M. Bus Incident, the January 2013 A.M. Threat Incident, Alleged Incident 4, and Alleged Incident 5. There is no admissible evidence that any of these incidents involved, and the e-mail makes no reference to, any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[106]

288.    The nineteenth purported report, dated January 28, 2013, was a meeting between D.B.'s mother, D.B.'s father, and Defendant Gilfus concerning the January 2013 A.M. Bus Incident. No reference was made in the meeting to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication

---

[105]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[106]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.  Plaintiff also argues that D.B.'s mother's testimony regarding what D.B. told her would not constitute hearsay or would fall under a hearsay exception without providing which exception or any specific citation to the record.  As set forth above in footnote 19 of this Decision and Order, the Court finds that D.B.'s mother's testimony constituted at least one layer of inadmissible hearsay.

that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[107]

289.    The twentieth purported report, dated March 19, 2013, was a verbal discussion with, and an e-mail to, Defendant Gilfus concerning the March 2013 Orange Peel Incident. There is no admissible evidence that the March 2013 Orange Peel Incident involved conduct directed at D.B. at all (as opposed to a poor throw at T.M.), let alone that it involved any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic. D.B.'s mother admits she does not recall if she ever told Defendant Gilfus during the verbal discussion that the March 2013 Orange Peel Incident involved any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic. The e-mail does not contain any reference to such issues.[108]

290.    The twenty-first purported report, dated March 20, 2013, was an e-mail to Defendant Gilfus concerning D.B.'s mother's belief that not enough was being done with respect to the issues between N.B. and D.B. It did not contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or

---

[107]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not to create an issue of fact for trial.

[108]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order. Plaintiff also argues that D.B.'s mother's testimony regarding what D.B. told her would not constitute hearsay or would fall under a hearsay exception without providing which exception or any specific citation to the record. As set forth above in footnote 19 of this Decision and Order, the Court finds that D.B.'s mother's testimony constituted at least one layer of inadmissible hearsay.

any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[109]

291.  The twenty-second purported report was an e-mail to Defendant Gilfus concerning his alleged failure to meet with D.B.'s case worker. This was not actually a separate communication, but part of the same March 19, 2013, e-mail as the twentieth purported report. It did not contain any reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.

292.  The twenty-third purported report, dated June 11, 2013, was a meeting with Defendant Gilfus concerning the June 2013 Fight Incident. The June 2013 Fight Incident did not involve, and the meeting contained no reference to, any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[110]

293.  The twenty-fourth purported report, dated September, 2013, was a telephone conversation with Defendant Gilfus concerning the September 2013 Neck Poking Incident. The September 2013 Neck Poking Incident did not involve, and the telephone conversation did not contain any reference to, any disability or perceived disability of

---

[109]  Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[110]  As set forth above in footnote 44, and discussed above in ¶ 245 of this Decision and Order, Plaintiff has no information that the June 2013 Fight Incident had anything to do with gender stereotyping or disability bias.

D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[111]

294. The twenty-fifth purported report, dated October 9, 2013, was an e-mail concerning Alleged Incident 8. There is no admissible evidence that Alleged Incident 8 occurred, and no claim that it involved any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic. Further, the e-mail contained no reference to any such matter.[112]

295. The twenty-sixth purported report, dated January 23, 2014, was an e-mail to Defendant House concerning the amount of time D.B. and his brother had to spend riding the school bus, and the supposed presence of "a number of students with behavior issues." It contained no reference to bullying or harassment at all, and no reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that there was alleged bullying and harassment due to discrimination on the basis of a protected characteristic.[113]

---

[111] Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[112] Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order. Plaintiff also argues that D.B.'s mother's testimony regarding what D.B. told her would not constitute hearsay or would fall under a hearsay exception without providing which exception or any specific citation to the record. As set forth above in footnote 19 of this Decision and Order, the Court finds that D.B.'s mother's testimony constituted at least one layer of inadmissible hearsay.

[113] Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

296. The twenty-seventh purported report, dated January 27, 2014, was an e-mail to Defendant House following up on the January 23, 2014, e-mail. It contained no reference to any disability or perceived disability of D.B., gender discrimination, gender stereotyping, antigay slurs, or any other indication that the alleged bullying and harassment was due to discrimination on the basis of a protected characteristic.[114]

The Allegations of M.M.2, A.B., and J.B.

*The Tenth Grade Comments*

297. M.M.2 claimed that, in the beginning of her tenth grade year, she saw unidentified students from "lower grades" tell D.B. he was a "retard" and use "vulgar words" such as, "ass" and "pedophile" (the "Tenth Grade Comments").

298. M.M.2 claimed in connection with the Tenth Grade Comments that D.B. told two teachers in the hallway–Ms. Babcock and Ms. Lamon–that there were "quite a few kids that had come up to him and said some vulgar words and call[ed] him a retard," and the teachers told D.B. to report it to the principal.

299. Ms. Babcock does not recall receiving any such report, and definitely did not report the matter to Defendant Gilfus or anyone else in the principal's office.[115]

---

[114]    Plaintiff provides the same or substantially the same response as the Court discussed above in footnote 93 of this Decision and Order.

[115]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial. Plaintiff also quotes from Defendant Gilfus's Annual Performance Review, which does not contradict this asserted fact.

300.	M.M.2 did not go to the office with D.B. and did not see him report the matter to the principal. There is thus no non-hearsay evidence that the matter was reported to Defendant Gilfus.[116]

301.	M.M.2 further claimed in connection with the Tenth Grade Comments that she told her English teacher that D.B. "would probably be late to class because he was in the office reporting someone saying harsh words to him," but that she did not describe the words used to the teacher.

302.	Defendant Gilfus never received any report of this matter.[117]

### The Tenth Grade Snowbank Incident

303.	M.M.2 also claimed that, during her tenth grade year, two unidentified middle school students shoved D.B. into a snowbank, saying "That's where you belong" (the "Tenth Grade Snowbank Incident").

304.	Nothing in M.M.2's description of the alleged Tenth Grade Snowbank Incident suggests any discriminatory motive relating to gender stereotyping or disability bias.[118]

---

[116]	Plaintiff argues that D.B.'s mother's testimony regarding what D.B. told her would not constitute hearsay or would fall under a hearsay exception without providing which exception or any specific citation to the record.  As set forth above in footnote 19 of this Decision and Order, the Court finds that D.B.'s mother's testimony constitutes at least one layer of inadmissible hearsay.

[117]	As set forth above in footnote 12 of this Decision and Order, Plaintiff's challenge to Defendant Gilfus' affidavit without any specific citation to the record to dispute his credibility is insufficient to create an issue of fact for trial.

[118]	As set forth above in footnote 44 of this Decision and Order, Plaintiff's argument that students knew of D.B.'s mental health history and rumors about his sexual orientation is hearsay. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history and/or sexual orientation is entirely speculative, lacking any facts or allegations that such a connection exists.  Such a speculative, unsupported allegation by Plaintiff is insufficient to create an issue of fact for trial.

305. M.M.2 admitted after that the middle-school students involved in the Tenth Grade Snowbank Incident did not bother D.B. again to her knowledge.[119]

*The S.S. Punch Incident*

306. M.M.2 also claimed she witnessed S.S. punch D.B. in the head following an argument about a binder (the "S.S. Punch Incident").

307. Nothing about the S.S. Punch Incident as described by M.M.2 suggests any discriminatory motive based on gender stereotyping or disability bias.[120]

308. Although M.M.2 claimed D.B. went to the office to report the S.S. Punch Incident, and although from outside the closed door she could see D.B. speaking to the principal, she admitted she did not hear what, if anything, D.B. said to the principal. There is thus no non-hearsay evidence that any discriminatory motive was reported to Defendant Gilfus or any other District employee.

309. No one else ever reported the S.S. Punch Incident to Defendant Gilfus.[121]

---

[119]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial. In addition, Plaintiff's citation to M.M.2's testimony supports the fact asserted.

[120]    As set forth above in footnote 44 of this Decision and Order, Plaintiff's argument that students knew of D.B.'s mental health history and rumors about his sexual orientation is hearsay. Moreover, D.B.'s mother's testimony that students engaged in this incident because they knew of D.B.'s mental health history and/or sexual orientation is entirely speculative, lacking any facts or allegations that such a connection exists. Such a speculative, unsupported allegation by Plaintiff is insufficient to create an issue of fact for trial.

[121]    Plaintiff disputes this fact because M.M.2 testified she "witnessed" D.B. report the incident to the office and speak with Gilfus. As set forth above in ¶ 308 of this Decision and Order, M.M.2 fails to present any non-hearsay testimony about D.B.'s alleged report to Gilfus. Moreover, as set forth above in footnote 12, Plaintiff's challenge to the credibility of Defendant Gilfus, without more is insufficient to create an issue of fact for trial.

310. M.M.2 further claimed she heard D.W. calling D.B. a "faggot" multiple times in the hallways between classes (the "D.W. Slurs Incident").

311. M.M.2 did not know if any District employee heard D.W. do this.

312. M.M.2 admitted she did not report to any District employee when she heard D.W. call D.B. an antigay slur in connection with the D.W. Slurs Incident.

313. M.M.2 said she had herself reported students being rude and calling D.B. names "quite a few times," but in follow-up questioning clarified that these were not the instances involving D.W. or the use of the word "faggot"; instead they were different situations discussed below.

314. Although M.M.2 claimed D.B. himself went to the office on one or two occasions to report D.W. calling him antigay slurs, and although from outside the closed door she could see D.B. speaking to the principal, she admitted she did not hear what, if anything, D.B. said to the principal beyond that "there were kids calling [D.B.] names." There is thus no non-hearsay evidence that D.W.'s use of an antigay slur against D.B. was reported to Defendant Gilfus or any other District employee.[122]

315. No one ever reported to Defendant Gilfus that D.W. had used antigay slurs against D.B.[123]

---

[122] As set forth above in footnote 121 of this Decision and Order, Plaintiff's response is insufficient to create an issue of fact for trial.

[123] As set forth above in footnote 121 of this Decision and Order, Plaintiff's response is insufficient to create an issue of fact for trial.

## The A.M. Tripping/Slur Incident

316. M.M.2 claimed that A.M. accused D.B. of tripping him and called D.B. a "faggot" while they were on the school bus (the "A.M. Tripping/Slur Incident").

317. M.M.2 allegedly reported the A.M. Tripping/Slur Incident to the bus driver, but not to anyone else.

318. No report of the A.M. Tripping/Slur Incident or of A.M. calling D.B. a "faggot" was ever received by Defendant Gilfus.[124]

## The R.J. Studyhall Incident

319. The only example A.B. remembered of a school district employee being present for and witnessing alleged bullying or harassment of D.B. was when a study hall monitor observed R.J. throwing papers and other items at D.B. and instructed R.J. to "knock it off." (the "R.J. Studyhall Incident").

320. A.B.'s description of R.J.'s conduct during the R.J. Studyhall Incident does not include any indication that the alleged throwing of items was motivated by any discriminatory bias based on gender stereotyping or disability.[125]

321. A.B. admitted he never reported the R.J. Studyhall Incident to anyone.

---

[124] As set forth above in footnote 121 of this Decision and Order, Plaintiff's response is insufficient to create an issue of fact for trial.

[125] Plaintiff's response states, "M.M.2 could not have known S.S.'s motivation behind punching D.B." As a threshold matter, this is incorrect, because such knowledge could have been conferred through the contemporary utterance of a slur. In any event, Plaintiff's response is unresponsive to the asserted fact. In addition, as set forth above in ¶ 308 of this Decision and Order, M.M.2 fails to present any non-hearsay testimony about D.B.'s alleged report to Gilfus. Finally, as set forth above in footnote 12, Plaintiff's challenge to the credibility of Defendant Gilfus, without more is insufficient to create an issue of fact for trial.

322.	No one ever reported to Defendant Gilfus that R.J. was throwing items at D.B. in connection with the R.J. Studyhall Incident.[126]

***The Overheard Dog-Abuse-Rumor Incident***

323.	The one occasion J.B. recalled in which a school district employee witnessed students discussing the Dog Abuse Rumor involved B.B. allegedly asking a group of students, out of D.B.'s presence, whether they had heard that D.B. had sexual intercourse with dogs, and a studyhall monitor overheard the conversation (the "Overheard Dog-Abuse-Rumor Incident").

324.	J.B. left the room immediately and did not witness what the studyhall monitor did upon hearing the rumor.

325.	No one ever reported to Defendant Gilfus that the Overheard Dog-Abuse-Rumor Incident had occurred.[127]

<u>A Summary of the Few Alleged Reports by M.M.2, A.B., and J.B.</u>

326.	M.M.2 admitted that the only times she made a report to a school district employee concerning an incident in which D.B. was allegedly bullied or harassed were (1) the time she told her English teacher that D.B. would be late to class, (2) her report that a middle-school student pushed D.B. into a snowbank, and (3) the time she reported to a bus driver that A.M. called D.B. a "faggot."

---

[126]	As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

[127]	As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

327. M.M.2 admitted there were no other times where she reported something to a staff member or a teacher or administrator, or actually saw someone else report to a teacher or staff member or administrator, something a student had done or said to D.B.

328. Although M.M.2 claims D.B. told her that on other occasions he had reported instances of antigay slurs to school district employees including Defendant Gilfus, she admits she was not present for such reports and is relying on hearsay from D.B. She also admits that, even when she saw D.B. go into the office one or two times (purportedly to report incidents in which he was bullied or harassed), she did not hear the part of the conversation in which he actually made the report and is thus not in a position to testify that D.B. actually told Defendant Gilfus that antigay slurs were employed.[128]

329. A.B. admitted he never reported any incident of bullying or harassment of D.B. to any school district employee, and had no information that any reports were made.

330. J.B. testified that the only time he ever reported any incident involving D.B. was when he told a studyhall monitor in middle school that someone had called a friend of his "faggot," without specifying that the target was D.B.

331. This report was not forwarded to Defendant Gilfus and there is no evidence this report was forwarded to anyone else at the District.[129]

---

[128]    Plaintiff disputes this fact by citing to the testimony of J.B. that he did not witness D.B. report any incidents because it was confidential and no one else could follow you to ensure you told. However, J.B.'s testimony does not dispute the asserted fact. M.M.2's testimony does not raise an issue of fact that D.B. reported instances of antigay slurs to district employees including Defendant Gilfus.

[129]    As set forth above in footnote 2 of this Decision and Order, Plaintiff's lack of sufficient knowledge does not create an issue of fact for trial.

332.     J.B. does not have any non-hearsay information that any other incident of alleged

         bullying or harassment of D.B. was ever reported to a school district employee.[130]

Events After October, 2013

333.     D.B. did not report any alleged incidents of bullying, harassment, or discrimination after

         November or December, 2013 and through March 3, 2014.

334.     In fact, D.B., when asked, would say school was "good."

335.     D.B.'s grades improved to the point that he was on the honor roll during his junior year.

336.     He also began to speak of choosing a college and pursuing a career as a DEC officer.

337.     D.B. repeatedly expressed hatred of his mother, and to some degree his father, accusing

         them of abusing him.

338.     On March 3, 2014, D.B. sent a series of insulting texts to T.M., under the cloak of an

         alias T.M. did not recognize ("Jimmie Fatman") (the "March 2013 Suicide Texts

         Incident"). D.B. and T.M. exchanged a series of insults with one another.  D.B. told T.M.

         that T.M. should show his parents a picture D.B. texted him–of a man aiming a gun at his

         own head–and tell them to "follow [in] his footsteps." D.B. added, "Maybe you should

         to[o] and make the world a better place." T.M. said, "I hope u die" and other insults,

         although he did not specifically urge the texter to kill himself at that point. D.B. then said,

---

[130]    Plaintiff argues that the "information" would not constitute hearsay or would fall under a
hearsay exception without providing which exception or any specific citation to the record.  As
set forth above in footnote 19 of this Decision and Order, the Court finds that Plaintiff did not
direct the Court to any specific citation in the record from J.B. identifying non-hearsay
information that any other incident of alleged bullying or harassment of D.B. was ever reported
to a school district employee.  Moreover, as set forth above in footnote 128 of this Decision and
Order, J.B.'s testimony that reports were confidential and that one could not follow another
student to hear what he or she told a school district employee does not create an issue of fact for
trial.  There is no admissible evidence before the Court from J.B. of alleged bullying or
harassment of D.B. that was reported to a school district employee.

"And [by the way] u don't have to worry bout me dying cause that's happenin tonight haha, just thought if let u know how I felt before I pulled the trigger." He also said, "I hope u and ur welfare lowlife scummy family go to[o]," and continued with further insults. T.M. then responded in kind, saying, "And do whatever please kill your self though."

339.    T.M. had neither initiated the exchange of texts nor been the initiator of suggestions to commit suicide.

340.    On March 3, 2014, at approximately 5:30 p.m., while at home in his bedroom, D.B. committed suicide.

Notices of Claim

341.    Plaintiff served a notice of claim upon the school district on or about May 8, 2014.

342.    Plaintiff served an amended notice of claim upon the school district on October 3, 2014.

**C.    Parties' Briefing on Defendants' Motion to Strike Deposition Testimony**

Generally, in support of their motion to strike the deposition testimony of Defendants Joseph Gilfus and John Warneck, Defendants assert the following three arguments: (1) it was improper for Plaintiff's counsel to examine the deponents regarding documents not placed before them while implicitly misrepresenting the nature of the documents; (2) Plaintiff's counsel engaged in other improper questioning throughout the depositions of Defendants Gilfus and Warneck, for example (a) Plaintiff's counsel persisted in questioning the deponents concerning documents and matters that the witnesses already testified they did not have any knowledge of, (b) Plaintiff's counsel asked palpably improper questions primarily circling around when Defendant Gilfus "began" complying with particular directions that Defendant Gilfus maintained he had always complied with, (c) Plaintiff's counsel engaged in argumentative exchanges and

self-serving comments injecting his own opinions in the record rather than asking questions, (d) Plaintiff's counsel interrupted Defendant Gilfus and refused to allow him to complete his answers, and (e) Plaintiff's counsel took the position that Defendants' counsel could not advise his client not to answer a question if the sole source of his information was Defendants' counsel; and (3) the severity and frequency of Plaintiff's counsel's objectionable conduct during the depositions makes individual rulings by the Court impractical and requires striking the deposition transcripts in their entirety. (Dkt. No. 177, Attach. 9.)

Generally, in response to Defendants' motion to strike, Plaintiff asserts the following four arguments: (1) Defendants cite no authority for their contention that allegedly abusive deposition tactics justify striking the entirety of a witness's deposition testimony; (2) the only document at issue in the Gilfus deposition was the Code of Conduct, which speaks for itself; (3) there are other, less drastic, remedies available to the Court than striking because (a) Defendants are able to move to strike any answer to any allegedly improper question at trial, (b) on a motion for summary judgment Defendants may submit an affidavit that does not contradict but may complete the record, and (c) Defendants' counsel was free to ask follow-up questions to place answers in context at the deposition; and (4) Plaintiff's counsel is allowed to try and impeach a witness at a deposition and thus Plaintiff's counsel's argumentative questions provide no basis to strike the Gilfus deposition. (Dkt. No. 189, Attach. 9.)

Generally, in their reply, Defendants assert the following two arguments: (1) the remedies of moving against individual responses and providing an affidavit clarifying responses are inadequate to protect Defendants from the results of the improper questioning because Plaintiff's counsel's improper conduct pervaded the seven hour-long depositions; (2) Plaintiff's counsel's

argumentative questions are not immunized by re-labeling them as "impeachment." (Dkt. No. 195.)

### D. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law-in-Chief

Generally, in support of their motion to for summary judgment, Defendants assert eight arguments. (*See generally* Dkt. No. 179, Attach. 20 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff cannot show that Defendants had actual notice that discriminatory harassment occurred. (*Id.*) As a result, Defendants argue that Counts One, Two, Three, Four, and Five (the "Federal Claims") must be dismissed. (*Id.*) With regard to Counts Three and Four against the District and the Board, Defendants argue that there is no admissible evidence that the Board, Warneck, or House, received actual notice of any harassment of D.B. prior to his death. (*Id.*) With regard to Counts Three and Four against Gilfus, Defendants argue that there is no admissible evidence that Gilfus had actual knowledge of any bias-related harassment of D.B. prior to his death. (*Id.*) With regard to Counts One, Two, and Five against the District and the Board, Defendants argue that there is no admissible evidence that an individual with authority to take remedial measures had actual knowledge of bias-related harassment of D.B. prior to his death. (*Id.*) Therefore, Defendants argue that Plaintiff's Federal Claims should be dismissed. (*Id.*)

Second, Defendants argue that, in the alternative, the Federal Claims also fail because Plaintiff cannot establish that any bullying, harassment, or discrimination was motivated by gender-stereotyping or disability bias. (*Id.*) Defendants argue that the qualities and habits attributed to D.B. by Plaintiff conform to male stereotypes. (*Id.*) Further, Defendants argue that there is no evidence that the students who used slurs such as "gay," "queer," and "faggot" in

relation to D.B. actually believed that D.B. was homosexual or acted in a way that contrasted with stereotypical male behavior and the use of those words alone is not enough to show gender-based discrimination or harassment. (*Id.*) Defendants argue that there is no admissible evidence establishing that any incident involving D.B. was motivated by his alleged disability. (*Id.*)

Third, Defendants argue that in the alternative, the Federal Claims also fail because the alleged gender stereotyping and disability-related conduct was not sufficiently severe, pervasive, and offensive. (*Id.*) Defendants argue that simple teasing and verbal insults do not rise to the level of actionable harassment. (*Id.*) Defendants argue that the incidents here were generally teasing and epithets and those physical in nature were of reasonably low severity, except for the acts of D.B. himself or the fight that he participated in arranging. (*Id.*) Moreover, Defendants argue that Plaintiff is barred from relying on anti-gay slurs to establish a hostile educational environment because D.B. himself participated in the environment of such slurs, indicating that he did not find such an environment subjectively offensive. (*Id.*)

Fourth, Defendants argue that, in the alternative, the Federal Claims also fail because Plaintiff cannot show deliberate indifference by Defendants because the District took substantial and meaningful steps to prevent and deter bullying before D.B.'s death. (*Id.*) Defendants point to curricular programs, assemblies, presentations, policies, and a Code of Conduct to argue that it is implausible for Plaintiff to suggest that Defendants were deliberately indifferent to disability or gender stereotype-related harassment. (*Id.*) In addition, with regard to the incidents involving D.B. that came to the District's attention, Defendants argue that the responses were not "clearly unreasonable," but were usually completely effective at stopping future incidents. (*Id.*)

Fifth, the individual defendants (Gilfus, Warneck, and House) are protected from liability as a matter of law by the doctrine of qualified immunity. (*Id.*) Defendants argue that, to the best

of the District's knowledge, any issues between D.B. and other students were addressed and ended. (*Id.*) Therefore, Defendants argue that it was clearly reasonable for individual defendants to believe that his actions did not violate D.B.'s rights. (*Id.*)

Sixth, Defendants argue that Counts Six and Seven (the "State Claims") fail because Plaintiff did not timely file a notice of claim. (*Id.*) Defendants argue that Plaintiff first served a notice of claim on or about May 8, 2014. (*Id.*) Therefore, Defendants argue that, to the extent Plaintiff's State Claims are based on conduct that occurred prior to 90 days before May 8, 2014, they should be dismissed. (*Id.*)

Seventh, Defendants argue that, in the alternative, Count Seven fails as a matter of law because Plaintiff does not establish that Defendants directly caused the emotional distress. (*Id.*) Instead, Defendants argue that Plaintiff alleges that Defendants were negligent leading to students bulling or harassing D.B., and only indirectly caused his emotional distress. (*Id.*)

Eighth, Defendants argue that, in the alternative, because the Federal Claims are all subject to dismissal, the Court should not assume pendant jurisdiction over any surviving State Claims. (*Id.*)

### 2.      Plaintiff's Opposition Memorandum of Law

Generally, in response to Defendants' motion for summary judgment, Plaintiff asserts two arguments. (*See generally* Dkt. No. 189, Attach. 9 [Pl.'s Opp'n Mem. of Law].)

First, Plaintiff argues that the jury may find in Plaintiff's favor under the gender-stereotyping harassment claims (Counts Four and Five) pursuant to Federal Law for three reasons: (1) the jury may find that D.B. was harassed and bullied because of his perceived sexual orientation and that the harassment was severe and pervasive, because (a) there is sufficient evidence that students routinely questioned D.B.'s sexuality calling him "faggot," "gay boy," and

"gay," and the Court should not attempt to make a fact-sensitive determination as to the intentions of those slurs, (b) the jury may find that even gender-neutral attacks against D.B. constituted attacks on his perceived sexual orientation and failure to conform with gender stereotypes (c) it is up to the jury to determine what harassment is actionable and if the harassment is severe, pervasive, objectively offensive, and discriminatory in effect, (d) the fact that D.B. used similarly offensive slurs in his text message exchanges does not mean that the jury must find that he welcomed the harassment, and (e) the jury could find that D.B. was deprived of a disparately hostile educational environment relative to his peers; (2) the jury may find that Defendant Gilfus knew D.B. was subjected to anti-gay bullying on a regular basis because (a) D.B. was bullied for several years and the District was well-aware of this harassment, (b) the jury may also find that the sexual orientation harassment was sufficiently widespread throughout the school that educational officials knew or should have known that D.B. was targeted for this reason, and (c) the jury may find that Gilfus knew about the severe and pervasive harassment and was deliberately indifferent to it; and (3) the jury may find that Defendants were deliberately indifferent to the harassment/bullying because, while some discipline was imposed in a few cases, many reported cases of harassment when unaddressed and undocumented by Gilfus and the discipline that was imposed was not effective in deterring further acts of bullying and harassment.  (*Id.*)

Second, Plaintiff argues that the jury may find in favor of Plaintiff's State Claims for the following four reasons: (1) Plaintiff timely filed a Notice of Claim and, in any event, New York Civil Practice Law and Rules ("CPLR") § 208 provides for tolling of the statute of limitations where the person entitled to commence an action is under a disability because of infancy at the time the cause of action accrues; (2) Plaintiff may prevail on the negligent supervision claim

because (a) negligent supervision claims involving student bullying are not analyzed under the deliberate indifference standard (given that, instead, schools are under a duty to adequately supervise students in their care and will be held liable for foreseeable injuries proximately related to the absence of adequate supervision), (b) the adequacy of supervision and proximate cause are issues of fact for the jury, and (c) the evidence in support of the federal deliberate indifference claims necessarily support the negligent supervision claim except that the negligent supervision claim does not require that D.B. was bullied or harassed because of his perceived sexual orientation; (3) Plaintiff may prevail on the negligent-infliction-of-emotional-distress claim because the injuries to D.B. were foreseeable and it is the jury's duty to determine whether Defendants' negligence caused Plaintiff's injuries; and (4) to the extent the Court dismisses the Federal Claims, this Court should still exercise supplemental jurisdiction over the State Claims. (*Id*.)

### 3.    Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants assert six arguments.  (Dkt. No. 194 [Defs.' Reply Mem. of Law].)

First, Defendants argue that Plaintiff cannot rely on hearsay from D.B. and has failed to present any admissible evidence to support essential allegations and elements of its claims.  (*Id*.) Defendants argue that Plaintiff did not satisfy its burden by relying on testimony that was on its face hearsay and simply asserting that it was hearsay within an exception without specifying the exception.  (*Id*.)

Second, Defendants argue that Plaintiff cannot prevail on its Federal Claims for three reasons: (1) Plaintiff failed to point to any evidence that Defendants House and Warneck had actual knowledge that D.B. was experiencing gender or disability based harassment and Plaintiff

failed to point to any evidence that any District policymaker had such knowledge; (2) there is no admissible evidence of actual knowledge of severe, pervasive, and objectively offensive harassment based on gender stereotyping or disability bias, (2) Plaintiff's alternative arguments relating to actual knowledge are without merit because (a) the admissible evidence of alleged incidents does not create a genuine issue as to whether Defendants knew of them, and (b) Plaintiff relies on hearsay including but not limited to reports allegedly made by D.B. and anonymous surveys of students which are inadmissible and fail to depict the kind of open and notorious harassment that would lead to a reasonable inference that Defendants were aware of it. (*Id*.)

Third, Defendants argue that Plaintiff cannot rely on bare terms like "gay" and "faggot" to establish that gender stereotyping was the motive for alleged harassment. (*Id.*)

Fourth, Defendants argue that they were not deliberately indifferent to known bias-related harassment. (*Id.*) In fact, Defendants argue that in, relying on hearsay, Plaintiff argues that D.B.'s classmates witnessed individuals engage in hostile, retaliatory acts or comments towards D.B. after Defendants took steps to separate D.B. and the other involved student(s). (*Id.*) Therefore, Defendants argue that Plaintiff is not claiming that Defendants did not respond at all, but instead arguing that Defendants should have taken other measures that D.B.'s mother would have preferred. (*Id*.)

Fifth, Defendants argue that qualified immunity applies even where a right is "clearly established" if the official acts under an objectively reasonable belief that he has not violated that right. (*Id*.)

Sixth, Defendants argue that Plaintiff has not met Defendants' arguments regarding its State Claims for three reasons: (1) Plaintiff did not address Defendants arguments regarding the

period for serving a notice of claim but instead focused on the tolling of the statute of limitations which was not an issue raised by Defendants; (2) Plaintiff has not addressed Defendants' argument that Count Seven fails for lack of direct causation of injury; and (3) in the alternative, if the Court dismisses the Federal Claims, it should decline to exercise supplemental jurisdiction over the State Claims. (*Id.*)

###### E. Parties' Briefing on Defendants' Motion to Strike "Plaintiff's Response to Defendants' Statement of Material Facts"

Generally, in support of their motion to strike "Plaintiff's Response to Defendants' Statement of Material Facts" (Dkt. No. 189, Attach. 7), Defendants assert the following: Plaintiff's response is not in compliance with Local Rule 7.1 of this District because, among other things, Plaintiff included (a) arguments, claims, and citations not responsive to assertions in the corresponding paragraphs of Defendants' Statement of Material Facts, (b) denials that were either unsupported by citations to record evidence or unsupported by citations to admissible/non-hearsay evidence, (c) paragraphs wholly unresponsive to the corresponding paragraphs of Defendants' Statement of Material Facts, (d) improper statements that Plaintiff lacks "personal" or "sufficient" information to respond or that the paragraph requires speculation, and (e) improper attempts to avoid admissions by responding only to part of a paragraph and omitting any response to some of the assertions in the paragraph. (*See generally* Dkt. No. 196, Attach. 20 [Defs.' Mem. of Law].)

To date, Plaintiff has not responded to Defendants' motion to strike Plaintiff's Response to Defendants' Statement of Material Facts. (*See generally* Dkt.)

## II.    GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[131] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there

---

[131]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[132]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[133] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See*

---

[132] Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[133] *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

Moreover, the "principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

## III. ANALYSIS

### A. Motion to Strike Deposition Testimony

After carefully considering the matter, the Court finds that it need not, and does not, consider Defendants' motion to strike the deposition transcripts of Defendants Warneck and Gilfus because, even if those transcripts are considered, Plaintiff has failed to identify sufficient evidence to survive summary judgment. *See Kilgore v. Allen-Bradley Co.*, 13-CV-4029, 2014 WL 7648988, at *1, n.1 (E.D.Pa. Nov. 12, 2014) (granting the defendant's motion for summary judgment and thus, not reaching defendant's motion to strike the plaintiff's deposition testimony); *Pace v. 3M*, 11-CV-67744, 2013 WL 1890281, at *1, n.1 (E.D. Pa. Apr. 17, 2013) (granting the defendant's motion for summary judgment and therefore finding as moot defendant's motion to strike deposition testimony); *Paul v. Cnty. of Union*, 04-CV-1543, 2005 WL 2083017, at *11-12 (D. Or. Aug. 22, 2005) (denying as moot defendants' motion to strike

deposition transcripts based on recommendation that defendants' summary judgment motion be granted even with consideration of plaintiff's evidence and plaintiff's submission of appropriate authentication documents with his response brief). Therefore, for purposes of deciding Defendants' motion for summary judgment, the Court will consider Defendants Warneck and Gilfus' deposition testimony.

### B. Motion for Summary Judgment

After carefully considering the matter, the Court grants Defendants' motion for summary judgment for the reasons stated in Defendants' memoranda of law. (Dkt. No. 179, Attach. 20; Dkt. No. 194.) To those reasons, the Court adds the following analysis.

### 1. Counts One, Two, and Three (Federal Claims Based on Disability Bias Discrimination)

"To make out a *prima facie* case under the ADA or Rehabilitation Act, a plaintiff must show '(1) that [he] is a qualified individual with a disability; (2) that the defendants are subject to [the pertinent statute]; and (3) that [he] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability.'" *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 241 (W.D.N.Y. 2012) (citing *Harris v. Mills*, 572 F.3d 66, 73-74 [2d Cir. 2009]).[134]

---

[134] "Claims under Title II of the ADA and section 504 of the Rehabilitation Act are analyzed identically." *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 241 (W.D.N.Y. 2012) (citing *Henrietta v. Bloomberg*, 331 F.3d 261, 272 [2d Cir. 2003]); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("Section 504 of the Rehabilitation Act and the ADA impose identical requirements, [therefore] we consider these claims in tandem."). However, disability discrimination in violation of the equal protection clause that "is premised upon substantive rights provided by the ADA . . . is not actionable under Section 1983." *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 235-36 (E.D.N.Y 2015) (collecting cases).

"[A] plaintiff must establish . . . harassment [by] students that is so severe, pervasive, and objectively offensive, and that so undermines and distracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650-51 (1999).

"[W]here, as here, a plaintiff seeks *monetary damages*, their burden is far greater: '[M]onetary damages are recoverable only upon a showing of an *intentional* violation.'" *A.M. ex rel. J.M. v. NYC Dept. of Educ.*, 840 F. Supp. 2d 660, 679 (E.D.N.Y. 2012) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 [2d Cir. 2009]) (emphasis in originals). "The standard for intentional violations is 'deliberate indifference to the strong likelihood [of] a violation." *Bartlett v. New York State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998), *rev'd on other grounds*, 527 U.S. 1031. "Deliberate indifference can be shown when: '[A]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond." *A.M. ex rel. J.M.*, 840 F. Supp. 2d at 679 (quoting *Loeffler*, 582 F.3d at 276).

Plaintiff has failed to respond to Defendants' motion for summary judgment with regard to the disability discrimination claims. (*See generally* Dkt. No. 189.) As set forth above in Part I.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.

N.D.N.Y. L.R. 7.1(b)(3).[135]  Here, Defendants have shown that their argument possesses facial merit for the reasons stated in their motion papers.  The Court would add only that, even when construed with the utmost of special liberality, Plaintiff's response has failed to present any admissible evidence that (1) Defendants Gilfus, Warneck, House, and/or any other "appropriate person" with authority to enact remedial measures, had actual knowledge that the discriminatory disability bias harassment occurred and/or (2) the alleged acts of students were motivated by disability bias.  (*See generally* Dkt. No. 189.)

For all of these reasons the Court grants Defendants' motion for summary judgment with regard to Counts One, Two, and Three, and the Court does not, and need not, address Defendants' additional arguments with regard to these claims.

### 2.  Counts Four and Five (Federal Claims Based on Sex/Gender Discrimination)

Title IX provides as follows,

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

[135]  Alternatively, the Court can, and does, deem the challenged claims abandoned (regardless of the facial merit of the unresponded-to argument).  *See Jackson v. Fed. Exp.*, 776 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made-i.e. referencing some claims or defenses but not others-a distinction between *pro se* and counseled responses is appropriate.  In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate.  In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.  In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review.  This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

20 U.S.C. § 1681(a).[136]  Therefore, for a school to be held liable pursuant to Title IX for peer-to-peer sex harassment, it must be "deliberately indifferent to sexual harassment, of which [it] had actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).[137]

The peer harassment forming the basis for a Title IX claim must also be "gender-oriented."  *Davis Next Friend LaShona D.*, 526 U.S. at 651.  Title IX is concerned with discrimination based on "the gender status conferred by a particular set of characteristics" as opposed to discrimination "based on the act of sex."  *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364 (S.D.N.Y. 2016).  "Harassment, 'even harassment between men and women' is not automatically considered to be gender-based discrimination 'merely because the words used have sexual content or connotations.'"  *Nungesser*, 169 F. Supp. 3d at 364 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 [1998]).  In determining whether a student has been discriminated against because of the student's sex, the issue is the reasons for the *individual plaintiff's* treatment.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (affirming grant of summary judgment to defendants in Title VII case where female plaintiff was subjected to

---

[136]  "In analyzing Title IX harassment claims, courts frequently borrow from the body of law developed under Title VII."  *Patenaude v. Salmon River Cent. Sch. Dist.*, 03-CV-1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005) (McAvoy, J.) (citing *Torres v. Pisano*, 116 F.3d 625, 630 [2d Cir. 1997]).

[137]  "Although the terms 'gender' and 'sex' are often used interchangeably, they have distinct meanings. 'Gender' generally refers to a social construct based on psychological characteristics that classify an individual as feminine or masculine, while 'sex' generally refers to biological sex as evidenced by chromosomes, genitals, and other physical characteristics."  *Gram v. Intelligender, LLC*, 10-CV-4210, 2010 WL 11601035, at *1 n.2 (C.D. Cal. Oct. 8, 2010).

"highly cruel and vulgar'" harassment, but harassment did not reflect an attack on plaintiff as a woman). "In other words, was Plaintiff being harassed because of [his or her] gender or for some other reason?" *Patenaude v. Salmon River Cen. Sch. Dist.*, 03-CV-1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005) (McAvoy, J.).

The harassment must occur "under" the "operations of" a recipient; thus, the harassment must take place in a context subject to the school district's control. 20 U.S.C. §§ 1681(a), 1687; *Davis Next Friend LaShonda D.*, 526 U.S. at 645. Where the misconduct occurs during school hours, on school grounds, the conduct is taking place "under" an "operation" of the recipient. *Id.* at 646.

"Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 652.[138] For example, a "single instance of one-on-one harassment" unless the instance is "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity" is insufficient to meet this standard." *Sauerhaft v. Bd. Of Educ. Of Hastings-on-Hudson Union Free Sch. Dist.*, 05-CV-9087, 2009 WL 1576467, at *4 (S.D.N.Y. June 2, 2009) (quoting *Davis Next Friend LaShonda D.*, 526 U.S. at 652-53). In determining whether the alleged harassment meets the "severe,

---

[138] "Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. . . . students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651-52 (1999).

pervasive, and objectively offensive" requirement, the Court "view[s] . . . [the situation] as a whole, keeping in mind that students often engage in insults, banter, teasing, . . . and gender-specific conduct that can be upsetting to the student receiving it, but [such conduct] . . . does not amount to an actionable Title IX claim." *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227 (D. Conn. 2006).

Moreover, "School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. "In an inappropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649. For example,

Sex discrimination claims under 42 U.S.C. § 1983 are subsumed by the Title IX claim. *Patenaude*, 03-CV-1016, 2005 WL 6152380, at *7 (citing *Pfeiffer v. Marion Center Area Sch. Dist.*, 917 F.2d 779, 789 [3d Cir. 1990]; *Waid v. Merrill Area Pub. Schs*, 91 F.3d 857, 862-63 [7th Cir. 1996]; *Hayut v. State Univ. of New York*, 127 F. Supp. 2d 333 [N.D.N.Y. 2000] [Hurd, J.]). To the extent Count Four is not subsumed by Count Five, for the reasons discussed herein, Count Four still is dismissed because there is insufficient evidence to establish a claim of gender-based discrimination.

As set forth above in Part I.B. of this Decision and Order and after considering Plaintiff's Statement of Additional Facts in Dispute (Dkt. No. 189, Attach. 8), Plaintiff does not present any admissible evidence that (1) Defendants Gilfus, Warneck, House, and/or any other "appropriate person" with authority to enact remedial measures, had actual knowledge that the gender

discrimination harassment occurred and/or (2) the alleged acts of students were motivated by sex or gender discrimination.  (*See generally* Dkt. No. 189; Dkt. No. 179, Attach. 33, at 160-163.)

Arguably, Plaintiff identified three incidents in which employees of the District had knowledge that D.B. was bullied or harassed, taking place under an operation of the District. Furthermore, there is admissible evidence that the incidents involved some indicia of sex or gender stereotyping or disability bias.[139]  However, a teacher, a bus driver, and a studyhall monitor are not the same as Defendants Gilfus, House, Warneck or other individual within the District with authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf.  As set forth above in Part I.B.¶ 69 of this Decision and Order, it is undisputed that teachers, bus drivers, and studyhall monitors do not possess such authority. While Plaintiff cites to surveys conducted in the District to support its claims, these surveys are unsworn, unsigned, anonymous hearsay and thus are inadmissible.

Moreover, there were two (possibly three) instances identified by M.M.2, in which M.M.2 witnessed harassment of D.B., and thereafter D.B. went to the office, where M.M.2 could see D.B. speaking to Defendant Gilfus but could not hear what D.B. was saying.[140]  The first instance was the S.S. Punch Incident; however, there is no indication that this incident involved any discriminatory motive based on gender stereotyping or disability bias.  (Part I.B.¶ 308 of this Decision and Order).  The second instance was the D.W. Slurs Incident regarding which M.M.2

---

[139]    These three incidents are as follows: (1) The incident discussed above in footnote 15 of this Decision and Order, in which A.M. described someone calling D.B. a "retard" in earth science; (2) the A.M. Tripping/Slur Incident that M.M.2 reported to the bus driver; and (3) the incident in which J.B. reported to a studyhall monitor in middle school that someone had called a friend of his "faggot," without specifying that the target was D.B.

[140]    These incidents are as follows: (1) the S.S. Punch Incident (Part I.B.¶ 309 of this Decision and Order) and (2) the D.W. Slurs Incident (Part I.B.¶ 315 of this Decision and Order).

testified that she heard D.W. call D.B. a "faggot" multiple times in the hallways and that on one or two occasions D.B. went to the office and M.M.2 could see D.B. speaking to Defendant Gilfus but could not hear what D.B. was saying.

The Court does not find that such equivocal and incomplete statements by M.M.2 regarding D.B.'s possible report are enough to create a genuine issue of material fact for trial regarding whether Defendants had actual notice of gender stereotyping harassment of D.B. The Court finds this especially in light of Defendant Gilfus' testimony that, "[p]rior to D.B.'s death, no-one, including D.B. himself, ever stated to me that any District student had used an antigay slur or a slur suggesting gender stereotyping or disability discrimination with respect to D.B., except on one occasion in connection with the January 2013 A.M. Bus Incident in which I concluded D.B.'s claim that A.M. used an antigay slur was not true." (Dkt. No. 179, Attach. 2, at ¶ 7.)

However, even assuming *arguendo* that M.M.2's testimony regarding D.B.'s one or two reports to Defendant Gilfus about the D.W. Slurs Incident is enough to create a genuine issue of material fact regarding whether Defendants had actual notice of gender stereotyping harassment of D.B., the Court would still find that Plaintiff's failed to establish the harassment was so severe, pervasive, and objectively offensive that it can be rationally found to have deprived D.B. of access to the educational opportunities or benefits provided by the District. *See Sauerhaft*, 2009 WL 1576467, at *5 (holding that, while "the three e-mails sent to [a student] were objectively offensive, they do not constitute harassment so severe and pervasive that a jury could find that the standard for establishing Title IX liability is met here"), *aff'd, R.S. v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 371 F. App'x 231 (2d Cir. 2010); *Soriano ex rel. Garcia v. Bd. of Educ. of City of New York*, 01-CV-4961, 2004 WL 2397610, at *6 (E.D.N.Y.

Oct. 27, 2004) (holding that fourth-grade female's allegations of two instances of sexual harassment by two different fourth-grade boys nearly six months apart "failed to demonstrate that they rise to the level of pervasive harassment such that [plaintiff] was deprived of equal access to an institution's resources and opportunities"); *HB v. Monroe Woodbury Cent. Sch. Dist.*, 11-CV-5881, 2012 WL 4477552, at *15 (S.D.N.Y. 2012) ("[A]ssuming that Defendants had actual knowledge of this comment and turned a blind eye to it, the utterance of one comment by a student cannot be said to be so 'severe, pervasive and objectively offensive' that it effectively denied LB educational benefits.") (collecting cases); *cf. T.Z. v. City of New York*, 634 F. Supp. 2d 263, 271-72 (E.D.N.Y. 2009) (holding that there is a material issue of fact regarding whether the single incident was sufficiently serious where a student was groped by one boy, then held down while another boy removed her clothing and touched her buttocks, while several other students watched).

For each of these reasons the Court grants Defendants' motion for summary judgment with regard to Counts Four and Five.

### 3.    Counts Six and Seven (State Claims)

Pursuant to New York Education Law § 3813, a plaintiff seeking to pursue a tort claim against a school district or one of its officers must serve a notice of claim upon the school district pursuant to New York General Municipal Law § 50-e.  Satisfaction of the notice of claim requirement is a condition precedent that must be fulfilled to pursue such tort claims.  *Dingle v. City of New York*, 728 F. Supp. 2d 332, 348-48 (S.D.N.Y. 2010).

Defendants present an interesting argument regarding the timeliness of Plaintiff's Notice of Claim for its State Claims: Defendants argue that Plaintiff's Notice of Claim was not timely because there are no alleged incidents of bullying occurring in the ninety days prior to the filing

of the Notice of Claim.  It is clear that D.B.'s mother was on notice of the alleged harm D.B. was

suffering due to the bullying.  (Dkt. No. 179, Attach. 24, at 99; *see generally* Dkt. No. 189,

Attach. 27.)  In fact, D.B.'s mother testified that she told Defendant Gilfus after the January 2013

A.M. Bus Incident that she was concerned D.B. would "end up either killing himself or it would

be the next Columbine."  (Dkt. No. 189, Attach. 24, at 99.)  However, Plaintiff waited until May

8, 2014, to file a Notice of Claim, which was within the requisite ninety days after D.B.'s death.

(Dkt. No. 19, Attach. 2; Dkt. No. 189, Attach. 7, at ¶ 388.)  Plaintiff argues that, because the

statute of limitations was tolled pursuant to CPLR § 208, due to D.B.'s infancy, so too was the

deadline to file a notice of claim pursuant to New York Education Law § 3813 and General

Municipal Law § 50-e.  The Court need not, and does not, reach this thorny issue because the

Court declines to exercise pendant jurisdiction in this matter pursuant to 28 U.S.C. § 1367(c)(1),

(3).

　　　　For these reasons, Counts Six and Seven are dismissed pursuant to Defendants' motion

for summary judgment.

### C.　　Motion to Strike Plaintiff's Response to Defendants' Statement of Material Facts

　　　　Based on the Court's ruling in Part III.B. of this Decision and Order, dismissing

Plaintiff's causes of action even considering Plaintiff's Response to Defendants' Statement of

Material Facts, the Court deems Defendants' motion to strike Plaintiff's Response to

Defendants' Statement of Material Facts, as moot.  Further, as set forth above in Part I.B. of this

Decision and Order, the Court disregarded any of Plaintiff's arguments, unsupported denials,

denials based on lack of knowledge, and non-responsive factual assertions in response to

Defendants' Statement of Material Facts.  In addition, the Court deemed admitted facts not

expressly denied and supported by accurate record citations.  The Court also deemed Plaintiff's

"Counter Rule 7.1 Statement of Material Facts" (Dkt. No. 189, Attach. 8) as merely a Statement of Additional Material Facts in Dispute under Local Rule 7.1(a)(3).

ACCORDINGLY, it is

ORDERED that Defendants' motion to strike the deposition testimony of Defendants Warneck and Gilfus (Dkt. No. 177) is **DENIED** as moot; and it is further

ORDERED that Defendants' motion for summary judgment (Dkt. No. 179) is **GRANTED**; and it is further

ORDERED that Defendants' motion to strike Plaintiff's response to Defendants' Statement of Material Facts (Dkt. No. 196) is **DENIED** as moot; and it is further

ORDERED that Plaintiff's Second Amended Complaint (Dkt. No. 28) is **DISMISSED** in its entirety.

Dated:      August 29, 2018
               Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge